**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| The Estate of Max Steinberg | : | |
| By and through its | : | |
| Special Administrator Stuart Steinberg | : | |
| 5510 Newcastle Avenue, #209 | : | |
| Encino, CA 91216 | : | |
| | : | |
| and | : | |
| | : | |
| Evie Steinberg | : | |
| 5510 Newcastle Avenue, #209 | : | Civil Action No. _____ |
| Encino, CA 91216 | : | |
| | : | |
| and | : | |
| | : | |
| Stuart Steinberg | : | |
| 5510 Newcastle Avenue, #209 | : | |
| Encino, CA 91216 | : | |
| | : | |
| and | : | |
| | : | |
| Paige Steinberg | : | |
| 5510 Newcastle Avenue, #209 | : | |
| Encino, CA 91216 | : | |
| | : | |
| and | : | |
| | : | |
| Jake Robert Steinberg | : | |
| 1600 S Bentley Avenue, #5 | : | |
| Los Angeles, CA  90025 | : | |
| | : | |
| Plaintiffs | : | |
| | : | |
| v. | : | |
| | : | |
| THE ISLAMIC REPUBLIC OF IRAN | : | |
| Ministry of Foreign Affairs | : | |
| Khomeini Avenue | : | |
| United Nations Street | : | |
| Tehran, Iran | : | |
| | : | |
| and | : | |
| | : | |
| THE SYRIAN ARAB REPUBLIC | : | |
| Ministry of Foreign Affairs | : | |

1

Damascus, SYRIA : : Defendants. :

## COMPLAINT

1.      This action is brought by the Plaintiffs, by and through their counsel, in the individual capacity of each Plaintiff and, as appropriate, in the capacity as personal representatives on behalf of estates, and the legal heirs thereof, and as more particularly described in the caption of this action for their own benefit, and for the benefit and on behalf of all those legally entitled to assert a claim under the Foreign Sovereign Immunities Act 28 U.S.C. § 1605A(c). Plaintiffs, by counsel, respectfully bring this action against Defendants Islamic Republic of Iran ("Iran") and the Syrian Arab Republic ("Syria") jointly and severally. This matter is related to, *inter alia,* (*Roth v Islamic Republic of Iran, et al.,* Civil Action Nos. 11-01377 (RCL) (D.D.C.); *Roth v Syrian Arab Republic, et al.,* Civil Action Nos. 14-01946 (RCL) (D.D.C.) and *Baxter, et al. v Islamic Republic of Iran, et al.* Civil Action Nos. 11-02133 (RCL) (D.D.C.)) in that it involves Iranian and Syrian sponsorship of the same terrorist organization, the Islamic Resistance Movement ("HAMAS") which has resulted in the death and injuries of American citizens.

## JURISDICTION, VENUE, AND CHOICE OF LAW

2.      This Court exercises subject matter jurisdiction in accordance with the provisions of 28 U.S.C. §§ 1330(a), 1331, 1332(a)(2), and 1605A.

3.      Defendant Islamic Republic of Iran has been designated as a State Sponsor of Terror by the United States Department of State, and continues to have been so listed since 1984 to the present day.

4.      Defendant Syrian Arab Republic has been designated as a State Sponsor of Terror by the United States Department of State, and continues to have been so listed since 1979 to the present day.

5.      Defendants Iran and Syria are subject to suit in the courts of the United States pursuant to 28 U.S.C. § 1605A.

6.      Venue lies in this Court pursuant to 28 U.S.C. § 1391(f)(4), which provides, in pertinent part, that a civil action against a foreign State may be brought in the United States District Court for the District of Columbia.

7.      Actions for wrongful death, personal injury and related torts perpetrated by foreign state sponsors of terrorism through their officials, employees, and agents within the meaning of 28 U.S.C. § 1605A(c) are unique causes of actions arising out of federal counterterrorism statute(s) and are controlled by applicable federal law.

## THE PARTIES

### A.  The Plaintiffs

8.      This action is brought by the Plaintiffs, by and through their counsel, in the individual capacity of each Plaintiff and on behalf of all those legally entitled to assert a claim under the FSIA as the Estate, survivors, family members and/or heirs of Max Steinberg.

### The Steinberg Family

9.      Plaintiff Estate of Max Steinberg ("Max"), a Los Angeles County, California estate, is represented in this action by its duly appointed Special Administrator, Stuart Steinberg. Max Steinberg was murdered on July 20, 2014 by a terrorist attack committed by HAMAS, a Foreign Terror Organization.   At the time of the acts alleged, and at all other times relevant hereto, Max Steinberg was a citizen of the United States and his California Estate has been opened on his behalf. Max Steinberg was, at all times relevant hereto, a victim of "torture" as defined in the TVPA and "personal injury" and "death" as required by 28 U.S.C. § 1605A. Plaintiff Estate of Max Steinberg can sue and be sued in this Court.

10.     Plaintiff Evie Steinberg was, and at all times relevant hereto, the biological mother of Max Steinberg, and a citizen of the United States. Plaintiff Evie Steinberg can sue and be sued in this Court.

11.     Plaintiff Stuart Steinberg was, and at all times relevant hereto, the biological father of Max Steinberg, and a citizen of the United States. Plaintiff Stuart Steinberg can sue and be sued in this Court.

12.     Plaintiff Paige Steinberg was, and at all times relevant hereto, the biological sister of Max Steinberg, and a citizen of the United States. Plaintiff Paige Steinberg can sue and be sued in this Court.

13.     Plaintiff Jake Steinberg was, and at all times relevant hereto, the biological brother of Max Steinberg, and a citizen of the United States. Plaintiff Jake Steinberg can sue and be sued in this Court.

B.   **The Defendants**

14.     Defendants Islamic Republic of Iran and Syrian Arab Republic are jointly and severally liable to Plaintiffs for all of their damages to the fullest extent of the law.

**The Islamic Republic of Iran**

15.     Defendant Islamic Republic of Iran is a foreign state that has been designated and continues to remain designated as a State Sponsor of Terrorism pursuant to § 60 of the Export Administration Act of 1979 (50 U.S.C. App. § 2405) and § 620(A) of the Foreign Assistance Act of 1961 (22 U.S.C. § 2371) since January 19, 1984.  Iran, at all times pertinent to this action, provided and continues to provide material support and resources to HAMAS, in aid and support of its violent campaign against the State of Israel, a member-state of the United Nations, and close ally of the United States ("Israel").

16.      Iran, through its actions, caused the death and injuries described herein, within the meaning of 28 U.S.C. § 1605A, by providing HAMAS with funding, direction, material support, encouragement, safe haven and/or training for its terrorist activities.

17.      Defendant Iran is liable for the actions of HAMAS and its agents.

### Syrian Arab Republic

18.      Defendant Syrian Arab Republic is a foreign state that has been designated and continues to remain designated as a State Sponsor of Terrorism pursuant to § 60 of the Export Administration Act of 1979, 50 U.S.C. App. § 2405, and § 620(A) of the Foreign Assistance Act of 1961 (22 U.S.C. § 2371) since December 29, 1979.  Syria, at all times pertinent to this action, provided and continues to provide material support and resources to HAMAS, in aid and support of its violent campaign against the State of Israel, a member-state of the United Nations, and close ally of the United States.

19.      Syria, through its actions caused the death and injuries described herein, within the meaning of 28 U.S.C. § 1605A, by providing HAMAS with funding, direction, material support, encouragement, safe haven and/or training for its terrorist activities.

20.      Defendant Syria is liable for the actions of HAMAS and its agents.

### STATEMENT OF FACTS

21.      Several dangerous terrorist organizations operate in the Palestinian territories administered by the State of Israel and/or the Palestinian Authority and located on the West Bank of the Jordan River and in Gaza, the most notable of them all of which is HAMAS. HAMAS committed widespread terrorist attacks during the First Intifada (1987 - 1993), the Second Intifada (2000 - 2005), before, during and since their violent takeover of the Gaza Strip in June 2007 following Israel's withdrawal from Gaza in 2005-6, and their subsequent and continuing terror attacks upon innocent citizens, residents and civilians living in and visitors to the State of Israel.

22.    HAMAS is the Islamic Resistance Movement and is a primarily radical Islamist terrorist organization that is committed to the globalization of Islam through violent "Jihad", which means "holy war".

23.    HAMAS is formally committed to the destruction of the State of Israel, a sovereign nation, is extremely anti-American, rejects achieving a peaceful resolution between Israel and the Palestinians and is committed to achieving its objectives by violent means, including acts of international terrorism.

24.    HAMAS is an acronym for "Harakat Muqawama Islamiyya," which was founded in December 1987.

25.    The HAMAS political documents calls for an Islamic Palestinian state throughout and in place of Israel by eliminating the State of Israel through violent jihad.

26.    HAMAS propaganda since the September 11, 2001 World Trade Center attacks has praised and glorified Osama bin Laden and his supporters engaged in global jihad.

27.    Through its military wing, Izz ad-Din al-Qassam Brigades, HAMAS commits criminal activity, including murder, attempted murder, solicitation to commit murder, and numerous other acts of international terrorism, as defined by 18 U.S.C. § 1331, in violation of the  criminal code of the United States.

28.    On January 25, 1995, HAMAS was designated as a Specially Designated Terrorist organization and, on October 8, 1997, by publication in the Federal Register, the United States Secretary of State designated HAMAS as a Foreign Terrorist Organization pursuant to Section 219 of the Immigration and Nationality Act as amended by the Antiterrorism and Effective Death Penalty Act of 1996. HAMAS is also designated as a Specially Designated Global Terrorist Organization.

29.    On repeated occasions and over a prolonged period of time, HAMAS has launched thousands of rockets into Israel, causing loss of life and destruction of property.  HAMAS also has dug

terror fences under Gaza in order to infiltrate the State of Israel to commit attacks upon Israeli citizens and the many American and other visitors to and residents of Israel. HAMAS has also committed kidnapping and hostage taking in order to put pressure on the Israeli and American governments, consistent with its rejectionist and terror activities. In the summer of 2014, HAMAS again dramatically escalated its terrorist activities, including rocket launchings, hostage-taking and actualizing terror threats upon the southern region of Israel.

30.     In order to launch terrorist attacks on Israel without rockets, HAMAS built elaborate tunnels underground to smuggle terrorists into Israel. Israeli authorities call these tunnels "terror tunnels."

31.     HAMAS uses terror tunnels to burrow beneath the Israeli border to carry out attacks such as abductions, infiltrations into Israeli communities, mass murders, hostage-takings, and attacks upon schools and private homes in Israel.

32.     The terror tunnels are also used within the Gaza Strip to hide the movement of and to store HAMAS rockets and other weapons.

33.     These tunnels are elaborate passageways that can be over a mile long and up to 100 feet deep.

34.     In October 2013, a terror tunnel was discovered east of the Gaza border that was 1.5-mile-long.  It is estimated that this tunnel cost nearly $10 million to build. It required 800 tons of concrete, was equipped with electricity, and contained enough food to last for a few months.

35.     In order to hide the tunnels, HAMAS often builds them underneath schools and other civilian buildings, including schools sponsored, financed, and supported by UNRWA, the United Nations Relief Works Agency.

36.     On June 12, 2014, HAMAS kidnapped three teenaged boys at a bus stop in the West Bank.

37.     This kidnapping was the first of many actions HAMAS undertook to launch and maintain an escalated campaign of terror in the summer of 2014.

38.     Saleh Arouri, founder and commander of Izz ad-Din al-Qassam Brigades, HAMAS' military wing, claimed that the kidnapping was an attempt to spark another intifada.

39.     During the First Intifada and Second Intifada, HAMAS carried out hundreds of terrorist attacks in which they intentionally injured and killed American citizens through suicide bombings, shootings and a wide variety of terror activities.

40.     On July 19, 2014, HAMAS terrorist agents slipped into Israel through a tunnel and murdered two Israeli citizens serving in the Israeli Defense Forces ("IDF").

41.     On July 20, 2014, Max Steinberg, an American citizen who had moved to Israel on September 11, 2012 to help in the response to the terror being waged against Israel, and who was serving in the Golani Brigade of the IDF, went to search for rocket launchers and terror tunnels in Gaza City, in keeping with his mission to help stop terror.

42.     While Max was in Gaza City for this counter=terrorism effort, a member of HAMAS shot at and hit Max's vehicle with an anti-tank rocket.

43.     Max was killed by the terrorists' rocket attack.

**THE MURDER OF MAX STEINBERG WAS AN ACT OF INTERNATIONAL TERRORISM**

44.      The death of Max Steinberg on July 20, 2014 was committed by HAMAS, a Foreign Terrorist Organization, with the material aid and support of Defendants Islamic Republic of Iran and the Syrian Arab Republic, and was an act of international terrorism.

45.     HAMAS was neither a sovereign entity nor *de facto* government at all times relevant hereto.

46.     HAMAS has claimed responsibility for the murder of Max Steinberg.

**IRAN'S SPONSORSHIP OF AND PROVISION OF MATERIAL SUPPORT AND RESOURCES TO HAMAS**

47.     The Islamic Republic of Iran has used and continues to use terror as a means of attempting to accomplish its foreign policy and uses terror organizations, such as HAMAS, Hezbollah and other terror organizations as its tools to commit the terror attacks.  This has been determined by the US Department of State, which listed the Islamic Republic of Iran on its 1984 list of State Sponsors of Terror, a status that has been continuously maintained since that time.  Numerous US District Court Judgments have been entered against Iran for supporting and sponsoring terror against Americans.

48.     The Islamic Republic of Iran is a republic in name only. In reality, it is a theocracy headed by a single cleric holding the title of Supreme Leader who has nearly complete control of the country's policies and actions. Externally it appears to be a democratic regime which conducts elections, but the truth is that the Supreme Leader is a dictator.

49.     The constitution gives the Supreme Leader the responsibility to set the general policies of Iran, including domestic and foreign policies.

50.     The Supreme Leader also is commander-in-chief of the armed forces, controls the intelligence and security operations, appoints leaders of the judiciary, state radio, and state television networks, and is supreme commander of the Islamic Revolutionary Guard Corps (IRGC).

51.     The Supreme Leader appoints half of the Council of Guardians, the body that oversees the Parliament, ensures laws are in compliance with Sharia Law, and determines which candidates are qualified to run for public office.

52.     The Supreme Leader, by and through his independent appointments, effectively controls what laws are passed and who is allowed to run for office.

53.     The first Supreme Leader, Ayatollah Ruhollah Khomeini, assumed power in 1979 after the overthrow of the government of the Shah of Iran. He instituted clerical rule and established the modern Iranian constitution, governed by Sharia law, and that establishes a Supreme Leader as the real head of the state.

54.     Khomeini ruled until his death on June 4, 1989.

55.     Seyyed Ali Khamenei was selected by the Assembly of Experts, an 86-cleric assembly, to be the second, and current, Supreme Leader in August 1989.

56.     Since his ascension to Supreme Leader, Khamenei has continued and expanded Khomeini's ideology of terrorism as an important tool of foreign policy.

57.     The Islamic Republic of Iran supports such Foreign Terrorist Organizations as HAMAS, HIZBALLAH (also spelled HEZBOLLAH) and PALESTINIAN ISLAMIC JIHAD.  Iran is publicly committed to the destruction and annihilation of the State of Israel, demonizes Israel at the United Nations and in the court of public opinion and supports international terror in pursuit of its political goals against both Israel and the United States of America.  Support for HAMAS from Iran territory or Iran government actors, on the scale required to facilitate, support, arm, embolden and encourage HAMAS, could not have been accomplished without the explicit authorization of the Iranian government and Iranian Military Intelligence through Supreme Leader Ali Khamenei.

58.     Iran has an extensive history of funding and supporting HAMAS terrorism with the goal of murdering citizens of the United States. A few of those attacks include, but are not limited to:

    a.     The Ben Yehuda Street bombing on September 4, 1997, in which three HAMAS operatives entered a crowded pedestrian mall in Jerusalem and detonated their suicide bombs killing five people and injuring nearly 200, including the American citizen Yael Botvin. This Court found Iran liable for funding, aiding, and supporting the HAMAS terrorists in the matter of <u>Estate of Botvin v. Islamic Republic of Iran</u>, 873 F. Supp. 2d 232 (D.D.C. 2012).

    b.     The Sbarro restaurant bombing on August 9, 2001, in which a HAMAS operative detonated a bomb that he carried in a guitar case, killing fifteen people including at least two American citizens, one of whom was Malki Roth. This Court found Iran

liable for the material support and training they provided to the HAMAS terrorist in the matter of Roth v. Islamic Republic of Iran, 78 F. Supp. 3d 379 (D.D.C. 2015).

c.   The April 30, 2003, suicide bombing at Mike's Place, a music club in Tel Aviv, Israel. A HAMAS suicide bomber detonated his explosives inside Mike's Place, a popular club next to the US Embassy to Israel and frequented by many tourists and US Embassy personnel.

59.   The Islamic Republic of Iran was designated by the United States Department of State on January 19, 1984 as a State Sponsor of Terrorism and continues to be so designated to the present day.  As such, Iran can be sued in this Court for providing material support to terror organizations which commit acts of international terror against Americans abroad.

60.   HAMAS is an international terrorist organization. It receives material support from Iran, Syria, and others. During the period relevant hereto, Defendant Iran provided HAMAS and its operatives with training bases, facilities, funding, and other material support for its terror activities. These training bases and facilities were located outside Tehran, Iran, in Dara Kazwin.

61.   HAMAS and its operatives utilized the training bases and facilities provided by Iran to train for the commission of acts of terrorism. This training included the use of firearms, explosives, and other weapons.

62.   HAMAS and its operatives also utilized these bases and facilities, *inter alia,* as depots for storage of weapons and explosives, to establish, maintain and operate a leadership command, organizational hierarchy and/or operational infrastructure, and/or offices/headquarters.

63.   Additionally, at all times relevant hereto, Iran provided HAMAS and its operatives with funding and training in terrorism activities, including training on the use of weapons and explosives.

64.     Upon information and belief, the training in terrorism activities was provided by and through Iran military and intelligence officials, and other agents, employees and officials of Defendant Iran.

65.     Upon information and belief, at all times relevant hereto, Defendant Iran also provided HAMAS and its leaders, officials, and operatives, with lodging, safe haven, and shelter permitting them to conduct their terrorist activities freely and unhindered.

66.     The duration, quantity, and quality Iran's material support, even if not designated for specific attacks, greatly contributed to HAMAS' ability to carry out terrorist attacks.  HAMAS could not have carried out the lethal attack described in this complaint without Iran's support and sponsorship. Iran and its agents knew and intended that HAMAS would continue to carry out further terrorist attacks, yet continue to support HAMAS to this very day.

67.     Therefore, as a direct and proximate result of the provision of the material support to HAMAS by the Defendant Iran as described herein, hundreds of innocent civilians were killed and grievously injured by acts of terrorism committed by HAMAS.  Among the civilians murdered and wounded by HAMAS' terrorist attacks committed with the material support of the Islamic Republic of Iran was Max Steinberg, whose Estate and families are each Plaintiffs named herein and are entitled to justice and an award of damages for the heinous act of terrorist murder committed upon the deceased and each of the plaintiffs, in amounts as shall be proven at the trial of the within action.

## SYRIA'S SPONSORSHIP OF AND PROVISION OF MATERIAL SUPPORT AND RESOURCES TO HAMAS

68.     The Syrian Arab Republic has used and continues to use terror as a means of attempting to accomplish its foreign policy and uses terror organizations, such as HAMAS, Hezbollah and other terror organizations as its tools to commit the terror attacks.  This has been determined by the US

Department of State, which listed the Syrian Arab Republic on its 1979 list of State Sponsors of Terror, a status that has been continuously maintained since that time.  Numerous US District Court Judgments have been entered against Syria for supporting and sponsoring terror against Americans.

69.     The Syrian Arab Republic is a republic in name only. In reality, it is a dictatorship and police state that strategically exhibits only the external forms of a democratic regime.

70.     Until a February 2012 referendum, its constitution vested one particular party – the Arab Socialist Ba'ath Party –with leadership functions in the State and society.

71.     Despite the constitutional referendum, the President still has the power to issue laws, and controls the legislative process.

72.     In 1966, Syrian Ba'athists conducted a coup d'état. The Ba'athists eliminated all political parties in opposition. Hafez Al-Assad was appointed Minister of Defense

73.     In 1970, Hafez Al-Assad led another coup, in which the Ba'ath party was purged of internal opposition, its leaders were jailed, and Hafez Al-Assad installed as President of the police state.

74.     The Al-Assad family has controlled the Syrian regime without interruption for forty-seven (47) years, since approximately 1970.

75.     Hafez Al-Assad had a three-decade Presidency, lasting from 1970 to 2000, in which he was confirmed President in unopposed referenda five consecutive times.

76.     He was succeeded by his son Bashar Al-Assad in 2000. Bashar Al-Assad was confirmed as President, leader of the Ba'ath Party and leader of the Army, for a 7-year term, by an unopposed referendum held in 2001 in which he claimed 97.2% of the vote.

77.     He was re-appointed in another unopposed referendum in 2007, this time claiming 97.6% of the vote.

78.     In 2014, Bashar Al-Assad was reelected to a third 7-year term, claiming 88.7% of the vote with polling only allowed in government-held territory.

79.     Members of President Al-Assad's own minority sect, the Al-Awali clan, control most key positions in the Syrian military and Syrian intelligence and security services.

80.     The Ba'ath Party, controlled by Al-Assad, is in control of the Syrian military, intelligence and security services, the latter consuming a large share of Syria's economic resources.

81.      President Al-Assad and his senior aides in the Syrian military and Syrian intelligence and security services make most important decisions in Syrian political and economic life.

82.     There are more than a dozen security services in Syria, some overlapping in their domains, to make sure that the whole of Syrian territory is covered. These security services answer directly to President Bashar Al-Assad and his brother General Maher Al-Assad, commander of the Syrian Republican Guard.

83.     Syria is a dictatorship which is committed to the destruction of the State of Israel and which uses the providing of material support for acts of terror as a means of expressing its political opposition to Israel and the United States of America.

84.     Syria provides extensive material support for HAMAS as part of its network of terror supporting activities in opposition to Israel and the United States of America.

85.     The Syrian Arab Republic was designated by the United States Department of State on December 29, 1979 as a State Sponsor of Terrorism and continues to be so designated to the present day.  As such, the Syrian Arab Republic can be sued in this Court for providing material support to terror organizations which commit acts of international terror against Americans abroad.

86.     Support for HAMAS from Syrian territory or by Syrian government actors, on the scale required to facilitate HAMAS, could not have been accomplished without the explicit authorization of the Syrian government and Syrian Military Intelligence through President Al-Assad. Syria's own

Foreign Minister once publicly admitted, with reference to terrorist attacks carried out by the Abu Nidal Organization with Syrian material support and sponsorship, "Whoever knows my government must realize that such attacks could not be carried out without its awareness."

87.     U.S. Department of State Bulletin 87, published in 1987 [Feb. 1987:73] states: "[a]vailable evidence indicates that Syria prefers to support groups whose activities are generally in line with Syrian objectives rather than to select targets or control operations itself. Damascus utilizes these groups to attack or intimidate enemies and opponents and to exert its influence in the region. Yet at the same time, it can disavow knowledge of their operations. Such Syrian-supported groups have carried out scores of attacks against Palestinian and other Arab, Turkish, Israeli, and Western targets…"

88.      The Bulletin lists many examples of Syrian sponsorship of terrorism and terrorist organizations.

89.     Syria has an extensive history of funding and supporting HAMAS terrorism with the goal of murdering citizens of the United States and of Israel. A few of those attacks include, but are not limited to:

    a.  The June 12, 2014, kidnapping and murder of three boys, two Israelis and one American, Naftali Frankel. The boys were kidnapped by HAMAS operatives at a junction inside the territory under the control of the State of Israel in Alon Shvut, an Israeli community southwest of Jerusalem, on their way home from school. After eighteen (18) days of intense searching, their bodies were discovered on the property of the head of the HAMAS cell that orchestrated the kidnapping and murders.

    b.  The October 22, 2014, vehicular attack by Abdel Rahman Shaludi, an agent and operative of HAMAS. Abdel drove a car to a light rail station in Jerusalem where he intentionally drove onto the tracks and rammed his vehicle into the crowd of people

attempting to kill as many pedestrians as possible. Among the crowd was an American baby, Chaya Zissel Braun, who was in a stroller when it was struck by the car. Chaya was thrown into the air before landing her head on the pavement; Chaya was pronounced dead two hours later in a nearby hospital.  This Court found Syria liable for the material support and training they provided to the HAMAS terrorist in the matter of <u>Braun v. Islamic Republic of Iran et al</u>, 228 F. Supp. 3d 64 (D.D.C. 2017).

90.     HAMAS is an international terrorist organization and has been designated as a Foreign Terrorist Organization by the United States Government. It receives material support from Syria, Iran, and others. During the period relevant hereto, Defendant Syria provided HAMAS and its operatives with training bases and facilities. These training bases and facilities were located within Syria, and in areas of Lebanon including in the Bakaa Valley occupied by and under the complete control of Syria.

91.     HAMAS and its operatives utilized the training bases and facilities provided by Syria to train for the commission of acts of terrorism. This training included the use of firearms, explosives, and other weapons.

92.     HAMAS and its operatives also utilized these bases and facilities, *inter alia,* as depots for storage of weapons and explosives, to establish, maintain and operate a leadership command, organizational hierarchy and/or operational infrastructure, and/or offices/headquarters.

93.     Additionally, at all times relevant hereto, Syria provided HAMAS and its operatives with funding and training in terrorism activities, including training on the use of weapons and explosives.

94.     Upon information and belief, at all times relevant herein, the training in terrorism activities was provided by and through Syrian military and intelligence officials, and other agents, employees and officials of Defendant Syria.

95.     Upon information and belief, at all times relevant hereto, Defendant Syria also provided HAMAS and its leaders, officials, and operatives, with lodging, safe haven, and shelter permitting them to conduct their terrorist activities freely and unhindered.

96.     The duration, quantity, and quality Syria's material support, even if not designated for specific attacks, greatly contributed to HAMAS' ability to carry out terrorist attacks.  HAMAS could not have carried out the lethal attack described in this complaint without Syria's support and sponsorship. Syria and its agents knew and intended that HAMAS would continue to carry out further terrorist attacks, yet continue to support HAMAS.

97.     As a direct and proximate result of the provision of the material support to HAMAS by the Defendant Syria as described herein, hundreds of innocent civilians were killed and grievously injured by acts of terrorism committed by HAMAS.  Among the civilians murdered and wounded by HAMAS' terrorist attacks is Max Steinberg, whose Estate and family are each Plaintiffs named herein and are entitled to justice and an award of damages for the heinous act of terrorist murder committed upon the deceased and each of the plaintiffs, in amounts as shall be proven at the trial of the within action.

### COUNT I
### (Under 28 U.S.C. §1605A(c) on behalf of All Plaintiffs)

98.      Plaintiffs repeat, reallege and incorporate by reference those facts and allegations set forth in all the foregoing paragraphs as if fully set forth herein.

99.     As recounted above, the death of Max Steinberg was caused by a willful and deliberate act of terror committed by the Foreign Terrorist Organization, HAMAS, with the material aid and support of the Defendants, the Islamic Republic of Iran and the Syrian Arab Republic, and each of them, who through their agents, financed the attack, planned the attack and rendered material support to the activities of HAMAS that resulted in the death of Max Steinberg. Those agents were at all times

acting with the scope of their agency and acted on the direction of and or with the material support of the Defendants, the Islamic Republic of Iran and the Syrian Arab Republic.

100.     As a direct and proximate result of the willful, wrongful and intentional act of the Defendants hereinabove described, for which the Defendants are vicariously, jointly and severally liable, Max and each of the listed Plaintiff family members of the Steinberg family endured extreme mental anguish, physical injury, pain and suffering, solatium, and loss of the affection, love and companionship of their loved son and brother, Max Steinberg, all to the damage of his Estate and their individual damage and for which the Plaintiffs and each of them seek an award of damages and judgment against the Defendants and each of them jointly and severally to the fullest extent of the law.

101.     WHEREFORE, the Plaintiffs and each of them demand that judgment be entered, jointly and severally, against the Defendants, The Islamic Republic of Iran and the Syrian Arab Republic, and each of them, for the damages they suffered, including, but not limited to, wrongful death, pain, suffering, mental anguish, emotional distress, and solatium in amount to be proven, and for their costs expended, including attorneys' fees, and as otherwise as permitted by this Court.

**COUNT II**
**LOSS OF SOLATIUM**
**(On behalf of Stuart Steinberg, Evie Steinberg, Jake Steinberg, Paige Steinberg)**

102.     The Plaintiffs repeat and re-allege each and every allegation set forth above with like effect as if alleged herein.

103.     As a direct and proximate result of the willful, wrongful, intentional, and reckless acts of the Defendants, their agents and instrumentalities, the family members of Max Steinberg suffered extreme mental anguish, emotional pain and suffering, and the loss of the society and companionship of the victims.

104.     Accordingly, Plaintiff's family members bring claims for loss of solatium against the Defendants pursuant to 28 U.S.C. § 1605A(c), or, in the alternative, the laws of the District of

Columbia and/or California.

105.     WHEREFORE, the individual Plaintiffs demand that judgment be entered against the Defendants in an amount to be proven for their compensatory damages, and otherwise as permitted by this Court.

### COUNT III
### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (On behalf of Stuart Steinberg, Evie Steinberg, Jake Steinberg, Paige Steinberg)

106.     The Plaintiffs repeat and re-allege each and every allegation set forth above with like effect as if alleged herein.

107.     On July 20, 2014, members of HAMAS willfully, violently, and forcefully launched a missile rocket at the vehicle in which Max Steinberg was riding in Gaza City.

108.     The act of launching a missile rocket at the vehicle on July 20, 2014 constituted extreme and outrageous conduct on the part of HAMAS members, whose acts were funded and directed by the Islamic Republic of Iran and the Syrian Arab Republic.

109.     As a direct and proximate result of the willful, wrongful, intentional, and reckless acts of HAMAS members, whose terrorist acts were funded and directed by the Islamic Republic of Iran and the Syrian Arab Republic, Plaintiffs suffered severe emotional distress, entitling them to compensatory damages.

110.     Each Plaintiff family member may assert a cause of action for intentional infliction of emotional distress against the Defendants in connection with the willful, wrongful, intentional, and reckless actions of HAMAS members.  Such cause of action may be asserted pursuant to 28 U.S.C. § 1605A(c), or, in the alternative, the laws of the District of Columbia and/or California.

111.     WHEREFORE, Plaintiffs demand that judgment be entered against the Defendants in an amount to be proven for their compensatory damages, and otherwise as permitted by this Court.

**COUNT IV**
**PUNITIVE DAMAGES**
**(Under 28 U.S.C. § 1605A(c) on behalf of all Plaintiffs)**

112.    The Plaintiffs repeat and re-allege each and every allegation set forth above with like effect as if alleged herein.

113.    The actions of the Islamic Republic of Iran, who has been committing, sponsoring, and supporting acts of international terror against Americans and others at least since 1979, and certainly since 1984 when it was designated as a State Sponsor of Terror; and the actions of the Syrian Arab Republic, who has been committing, sponsoring, and supporting acts of international terror against Americans and others at least since 1979, when it was designated as a State Sponsor of Terror are heinous in nature, politically motivated, and target the United States of America and the State of Israel, its citizens, residents and visitors,  render both Defendants, jointly and severally, liable for the heinous murder of Max Steinberg, thereby entitling his estate, and his family, and each of them as included herein as Plaintiffs, to an award of damages in accordance with the laws of the United States.

114.    The acts of the Defendants, and each of them, carried out by their agents as described above, were malicious, willful, unlawful and in wanton disregard of life and the standards of law that govern the actions of civilized nations. The loss of life as above described was intended as a result by each Defendant. Max Steinberg and each of his family members are each victims of the acts of international terror committed by HAMAS with the material support of each of the Defendants. The actions of those who carried out the attack described were within the scope of their agency on behalf of the Defendants. In accordance with the provisions of 28 U.S.C §1605A(c) the Plaintiffs are thereby entitled to a maximal award of punitive damages to the fullest extent of the law.

115.    The actions of HAMAS, as set forth hereinabove, were intentional and malicious and in willful, wanton, and reckless disregard of the Max Steinberg's rights and physical well-being. The actions of HAMAS were part of its ongoing and continuing campaign of terror committed against

citizens of the United States of America and the State of Israel in support of the political goals and aims of HAMAS to reject peace with Israel, to oppose US foreign policy in the region, and to use terror as a means of destroying the State of Israel, consistent with the positions of the Defendants, Iran and Syria, both of which are avowed enemies of Israel and oppose US foreign policy in the region. The acts of HAMAS were facilitated through funding, training, and material support by the Islamic Republic of Iran and the Syrian Arab Republic. In accordance with 28 U.S.C § 1605A(c) the Defendants, the Islamic Republic of Iran and the Syrian Arab Republic, and each of them, are therefore liable for the actions of HAMAS, the Foreign Terrorist Organization and its members. In providing such funding, material support, direction, and training, the Islamic Republic of Iran and the Syrian Arab Republic were acting within the scope of its agencies as an instrumentality. Said agencies rendered material support to those actually carrying out the act above described. This Court has previously found the Defendants liable for the support of HAMAS and other Foreign Terrorist Organizations. Notwithstanding said findings, the Defendants Iran and Syria have continued to this day to sponsor and support terror. The Defendants, and each of them, must be punished by this Court for their continuing acts of sponsorship of terror. The Defendants, and each of them, must be held out as an example to the world that this Court will not countenance acts of terror, nor those who materially support and fund terror. A maximal award of punitive damages is requested as against all Defendants, jointly and severally, in accordance with the provisions of 28 U.S.C. §1605A(c), each of which are liable for punitive damages.

116.    WHEREFORE, the Plaintiffs pray that judgment be entered, jointly and severally, against the Islamic Republic of Iran and the Syrian Arab Republic, on behalf of each Plaintiff, in the amount of one billion US Dollars ($1,000,000,000) for each of them, as against each of the Defendants, jointly and severally, and their costs herein expended.

## PRAYER FOR RELIEF

117.    WHEREFORE, Plaintiffs, request this Court find the Defendants, and each of them liable for the acts alleged herein and enter joint and several Judgment against the Defendants as follows:

118.    Awarding Plaintiffs compensatory damages against Defendants Islamic Republic of Iran and the Syrian Arab Republic, jointly and severally, in amounts set forth herein and as shall be determined at trial in accordance with evidence to be submitted to this Court;

119.    Awarding Plaintiffs solatium damages against the Defendants, jointly and severally, in amounts set forth herein and as shall be determined at trial in accordance with evidence to be submitted to this Court;

120.    Awarding Plaintiffs punitive or exemplary damages against Defendants Iran and Syria, jointly and severally, in the amount of one billion US dollars as punishment for their continued support for and sponsorship of acts of terror against Americans, and to send a message to the world that this Court will not countenance the continued sponsorship of terror by the Islamic Republic of Iran and/or the Syrian Arab Republic, in such amount and consistent with evidence as shall be determined at trial in accordance with evidence to be submitted to this Court;

121.    Awarding Plaintiffs prejudgment interest and post judgment interest as computed and calculated at the maximum rate allowable by law;

122.    Awarding Plaintiffs their costs and disbursements and reasonable allowances of reasonable fees for Plaintiffs counsel and experts and reimbursement of expenses;

123.    Leave to amend this Complaint as the interests of justice may allow; and

124.    Granting any and all such further relief as the Court may deem just and proper.

Dated: September 18, 2017

Respectfully submitted,

Heideman Nudelman & Kalik, P.C.
1146 19th Street, NW, Fifth Floor
Washington, DC 20036
(202) 463-1818

By: */s/Richard D. Heideman*
    Richard D. Heideman (DC Bar No. 377462)
    Noel J. Nudelman (DC Bar No. 449969)
    Tracy Reichman Kalik (DC Bar No. 462055)