# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| ESTATE OF MAX STEINBERG, et al. | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 17-1910-RCL |
| | ) | |
| ISLAMIC REPUBLIC OF IRAN, et al. | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## PLAINTIFFS' MEMORANDUM OF LAW WITH POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR ENTRY OF DEFAULT JUDGMENT AS TO ALL DEFENDANTS

Dated: August 9, 2019

Respectfully submitted,

HEIDEMAN NUDELMAN
& KALIK, P.C.
1146 19th Street, N.W., 5th Floor
Washington, DC 20036
Telephone:  202-463-1818
Telefax:  202-463-2999

By: /s/Richard D. Heideman
      /s/ Tracy Reichman Kalik

Richard D. Heideman (No. 377462)
Noel J. Nudelman (No. 449969)
Tracy Reichman Kalik (No. 462055)

## TABLE OF CONTENTS

Page

INTRODUCTION……………….…………………………….………………………..1

PROCEDURAL BACKGROUND………………………………………………………...3

ARGUMENT…………………………………………………………………………..4

I. The FSIA Requirements For Liability Under 28 U.S.C. § 1608(e)
Are Easily Met ……………………………………………………………....................4

II. Hamas' Responsibility for the Terrorist Attack Which Killed Max Steinberg ………………….....6

  A. Evidence and Expert Testimony Establish that Hamas is the Responsible Terrorist
    Organization for the July 20, 2014
    Attack………..…………………………………………….…………………...6

  B. Under Fed. R. Evid. 201, this Court can take judicial notice of previously-rendered
    conclusions of facts and law that establish Hamas' liability for acts of terrorism………...12

    1. Under Fed. R. Evid. 201, this Court may take judicial notice of findings of fact and
      conclusions of law, including those in judicial records……………………………12

    2. This Court may render a liability judgment against FSIA defendants either by
      reviewing evidence considered in an opinion that is judicially noticed, or by
      adopting previous findings of fact and conclusions of law……………………………14

III. The Islamic Republic Of Iran Is Liable For Supporting Hamas……………………………16

  A. Iran Provided Hamas with Logistical and Financial Support to Enable it to Commit the
    Terrorist Attack which killed Max Steinberg………………………………........................16

  B. Under Fed. R. Evid. 201, This Court Should Take Judicial Notice of the Numerous
    Decisions Finding that Iran Materially Supported Hamas in its Execution Of Acts Of
    Terrorism……………………………………………………………………………20

IV. The Syrian Arab Republic Is Liable As A State Sponsor Of Hamas………………..……...27

  A. Syria Provided Safehaven and Material Support to Hamas Leadership…………….….....30

  B. Syria provided Operational and Financial Support to Hamas…………..............................32

  C. Under Fed. R. Evid. 201, This Court Should Take Judicial Notice Of The Decisions
    Finding That Syria Materially Supported Hamas In Its Execution Of Acts Of Terrorism…34

i

## TABLE OF CONTENTS CONT'D

Page

V. Default Judgment May Be Properly Entered By This Court Against Iran and Syria As Plaintiffs Have Met Their Burden Of Proof………………………….......................................................35

VI. Upon Finding Iran and Syria Jointly and Severally Liable For Plaintiffs' Injuries, This Court Should Award Compensatory and Punitive Damages To Each Of The Plaintiffs……….........36

   A.   Economic Damages……………………………………………………………………37

      1.   The Estate of Max Steinberg Has Standing to Bring a Claim for Economic Damages……...37

      2.   The Estate of Max Steinberg Has Suffered Economic Loss………………………….38

   B.   Solatium/Intentional Infliction of Emotional Distress Damages……………………….......39

      1.   Evie Steinberg………………………………………………………………...41

      2.   Stuart Steinberg………………………………………………………………42

      3.   Paige Steinberg………………………………………………………………..43

      4.   Jake Steinberg………………………………………………………………...44

   C.   Punitive Damages………………………………………………………………….45

   CONCLUSION………………………………………………………………………49

# TABLE OF AUTHRORITES

Page(s)

<u>Cases</u>

*Acosta v. The Islamic Republic of Iran,*
  574 F. Supp. 2d 15 (D.D.C. 2008) ................................................................................ 47

*Agudas Chasidei Chabad of U.S. v. Russian Fed'n,*
  528 F.3d 934 (D.C. Cir. 2008) ..................................................................................... 4

*Anderson v. The Islamic Republic of Iran,*
  753 F. Supp. 2d 68 (D.D.C. 2010) ............................................................................... 13

*Arbaugh v. Y&H Corp.,*
  546 U.S. 500, 126 S. Ct. 1235, 163 L. Ed. 2d 1097 (2006) ...................................... 49

*Baker v. Socialist People's Libyan Arab Jamahirya,*
  775 F. Supp. 2d 48 (D.D.C. 2011) ........................................................................ 13, 48

*Beer v. Islamic Republic of Iran,*
  574 F. Supp. 2d 1 (D.D.C. 2008) .......................................................................... 22, 23

*Beer v. Islamic Republic of Iran,*
  2010 U.S. Dist. LEXIS 129953, at *7–8, *9 (D.D.C 2010) ............................... 16, 21

*Belkin v. Islamic Republic of Iran,*
  667 F. Supp. 2d 8 (D.D.C. 2009) ................................................................................ 40

*Bennett v. Islamic Republic of Iran,*
  507 F. Supp. 2d 117 (D.D.C. 2007) ............................................................................ 23

*Ben-Rafael v. Islamic Republic of Iran,*
  540 F. Supp. 2d 39 (D.D.C. 2008) .............................................................................. 15

*Ben-Rafael v. Islamic Republic of Iran,*
  718 F. Supp. 2d 25 (D.D.C. 2010) .................................................................. 13, 15, 18

*Bluth v. Islamic Republic of Iran,*
  203 F. Supp. 3d 1 (D.D.C. 2016) ........................................................................ passim

*Bodoff v. Islamic Republic of Iran,*
  424 F. Supp. 2d 74 (D.D.C. 2006) ........................................................................ 24, 41

*Bodoff v. Islamic Republic of Iran,*
  907 F. Supp. 2d 93 (D.D.C. 2012) .............................................................................. 16

*Booth v. Fletcher,*
  101 F.2d 676 (D.C. Cir. 1938) ............................................................................... 12, 13

*Braun v. Islamic Republic of Iran,*
  228 F. Supp. 3d 64 ................................................................................................. 26, 35

*Brewer v. Islamic Republic of Iran,*
  664 F. Supp. 2d 43 (D.D.C. 2009) ............................................................. 13, 14, 15, 26

*Calderon-Cardona v. Democratic People's Republic of Korea,*
  723 F. Supp. 2d 441 (D.P.R. 2010) ............................................................................ 48

*Campuzano v. Islamic Republic of Iran,*
  281 F. Supp. 2d 258 (D.D.C. 2003) ...................................................................... 15, 24

iii

*Certain Underwriters at Lloyd's London v. Great Socialist People's Libyan Arab Jamahiriya*,
  811 F. Supp. 2d 53 (D.D.C. 2011) ............................................................................. 13
*Commercial Bank of Kuwait v. Rafidain Bank*,
  15 F.3d 238 (2d Cir. 1994) ...................................................................................... 2, 36
*Cronin v. Islamic Republic of Iran*,
  238 F. Supp. 2d 222 (D.D.C. 2002) ............................................................................ 47
*Dammarell v. Islamic Republic of Iran*,
  404 F. Supp. 2d 261 (D.D.C. 2005) ............................................................................ 15
*Eisenfeld v. Islamic Republic of Iran*,
  172 F. Supp. 2d 1 (D.D.C. 2000) ............................................................................... 26
*Estate of Botvin ex rel. Ellis v. Islamic Republic of Iran*,
  510 F. Supp. 2d 101 (D.D.C. 2007) ............................................................................. 2
*Estate of Botvin v. Islamic Republic of Iran*,
  873 F. Supp. 2d 232 (D.D.C. 2012) ................................................................. 1, 12, 16, 21
*Estate of Brown v. Islamic Republic of Iran*,
  872 F. Supp. 2d 37 (D.D.C. 2012) .......................................................................... 13, 15
*Estate of Buonocore v. Great Socialist People's Libyan Arab Jamahiriya*,
  No. CIV.A. 06-727 JMF, 2013 WL 653921 (D.D.C. Mar. 13, 2013) .................................... 13
*Estate of Buonocore v. Great Socialist People's Libyan Arab Jamahiriya*,
  No. CIV.A. 06-727 JMF, 2013 WL 351610 (D.D.C. Jan. 29, 2013) .................................... 13
*Estate of Doe v. Islamic Republic of Iran*,
  808 F. Supp. 2d 1 (D.D.C. 2011) ............................................................................... 13
*Estate of Heiser v. Islamic Republic of Iran*,
  466 F. Supp. 2d 229 (D.D.C. 2006) ..................................................................... 13, 15, 40
*Estate of Heiser v. Islamic Republic of Iran*,
  659 F. Supp. 2d 20 (D.D.C. 2009) ......................................................................... 47, 48
*Fain v. Islamic Republic of Iran*,
  856 F. Supp. 2d 109 (D.D.C. 2012) ............................................................................ 13
*Flanagan v. Islamic Rep. of Iran*,
  2016 U.S. Dist. LEXIS 72331, *87 (D.D.C. June 3, 2016) ................................................ 33
*Flatow v. Islamic Republic of Iran*,
  999 F. Supp. 1 (D.D.C. 1998) ......................................................................... 40, 46, 47
*Fraenkel v. Islamic Republic of Iran*,
  248 F. Supp. 3d 21 (D.D.C. 2017) ........................................................................ passim
*Fritz v. Islamic Republic of Iran*,
  320 F. Supp. 3d 48 (D.D.C. 2018) .......................................................................... 5, 7, 8
*Gates v. Syrian Arab Republic*,
  580 F. Supp. 2d 53 (D.D.C. 2008) ............................................................................. 48
*Goldberg-Botvin v. Islamic Republic of Iran*,
  938 F. Supp. 2d 1 (D.D.C. 2013) ........................................................................... 21, 22
*Greenbaum v. Islamic Republic of Iran*,
  451 F. Supp. 2d 90 (D.D.C. 2006) ..................................................................... 15, 24, 40
*Haim v. Islamic Republic of Iran*,
  784 F. Supp. 2d 1 (D.D.C. 2011) ............................................................................... 13
*Han Kim v. Democratic People's Republic of Korea*,
  774 F.3d 1044 (D.C. Cir. 2014) ............................................................................ 35, 36

*Harrison v. Republic of Sudan*,
  882 F. Supp. 2d 23 (D.D.C. 2012) .......................................................................... 26, 28, 30
*Hill v. Republic of Iraq*,
  328 F.3d 680 (D.C. Cir. 2003) ............................................................................................. 37
*Holder v. Humanitarian Law Project*,
  561 U.S. 1, 130 S. Ct. 2705, 177 L. Ed. 2d 355 (2010) ...................................................... 17
*Howard Univ. v. Best*,
  484 A.2d 958 (D.C. 1984) .................................................................................................... 41
*Kilburn v. Socialist People's Libyan Arab Jamahiriya*,
  376 F.3d 1123 (D.C. Cir. 2004) .................................................................................... 33, 34
*Kirschenbaum v. Islamic Republic of Iran*,
  572 F. Supp. 2d 200 (D.D.C. 2008) ..................................................................................... 23
*Moradi v. Islamic Republic of Iran*,
  77 F. Supp. 3d 57 (D.D.C. 2015) ................................................................... 17, 18, 19, 20
*Mousa v. Islamic Republic of Iran*,
  238 F. Supp. 2d 1 (D.D.C. 2001) ......................................................................................... 25
*Murphy v. Islamic Republic of Iran*,
  740 F. Supp. 2d 51 (D.D.C. 2010) ................................................................................. passim
*Opati v. Republic of Sudan*,
  60 F. Supp. 3d 68 (D.D.C. 2014) .................................................................................. 12, 13
*Oveissi v. Islamic Republic of Iran*,
  768 F. Supp. 2d 1 (D.D.C. 2010) .................................................................................. 13, 15
*Oveissi v. Islamic Republic of Iran*,
  879 F. Supp. 2d 44 (D.D.C. 2012) ....................................................................................... 13
*Owens v. Republic of Sudan*,
  412 F. Supp. 2d 99 (D.D.C. 2006) ....................................................................................... 29
*Owens v. Republic of Sudan*, CA 08-1361, (JDB),
  2016 U.S. Dist. LEXIS 37464, at *89 (D.D.C. 2016) .......................................................... 4
*Paroline v. United States*,
  572 U.S. 434, 134 S. Ct. 1710, 188 L. Ed. 2d 714 (2014) .................................................. 34
*Prevatt v. Islamic Republic of Iran*,
  421 F. Supp. 2d 152 (D.D.C. 2006) ..................................................................................... 13
*Rimkus v. Islamic Republic of Iran*,
  750 F. Supp. 2d 163 (D.D.C. 2010) ..................................................................................... 13
*Roth v. Islamic Republic of Iran*,
  78 F.Supp.3d 379 (D.D.C.2015) .............................................................................. 1,15,16,20
*Roth v. Syrian Arab Republic*,
  No. 1:14-CV-01946-RCL, 2018 WL 4680270 (D.D.C. Sept. 28, 2018) ............... 1, 16, 21, 34
*Salazar v. Islamic Republic of Iran*,
  370 F. Supp. 2d 105 (D.D.C. 2005) ..................................................................................... 37
*Sisso v. Islamic Republic of Iran*,
  2007 WL 20075 (D.D.C. July 5, 2007) ................................................................................. 23
*Spencer v. Islamic Republic of Iran*,
  922 F. Supp. 2d 108 (D.D.C. 2013) ..................................................................................... 13
*Stern v. Islamic Republic of Iran*,
  271 F. Supp. 2d 286 (D.D.C. 2003) ..................................................................................... 25

*Taylor v. Islamic Republic of Iran,*
    811 F. Supp. 2d 1 (D.D.C. 2011) ................................................................................. passim
*United States v. Damrah,*
    412 F.3d 618 (6th Cir. 2005) .................................................................................................. 17
*Valencia v. Islamic Republic of Iran,*
    774 F. Supp. 2d 1 (D.D.C. 2010) ........................................................................................... 13
*Valore v. Islamic Republic of Iran,*
    700 F. Supp. 2d 52 (D.D.C. 2010) .................................................................................. passim
*Wachsman ex rel. Wachsman,*
    603 F. Supp. 2d 148 (D.D.C. 2009) ...................................................................................... 22
*Wagner v. Islamic Republic of Iran,*
    172 F. Supp. 2d 128 (D.D.C. 2001) ...................................................................................... 14
*Waldon v. Covington,*
    415 A.2d 1070 (D.C. 1980) ............................................................................................ passim
*Weinstein v. Islamic Republic of Iran,*
    184 F. Supp. 2d 13 (D.D.C. 2002) ................................................................................... 2, 25
*Welch v. Islamic Republic of Iran,* No. 01-863,
    2007 U.S. Dist. LEXIS 99191 (D.D.C. Sept. 20, 2007) ....................................................... 14
*Wultz v. Islamic Republic of Iran,*
    864 F. Supp. 2d 24 (D.D.C. 2012) ................................................................................. 13, 40

## Statutes

8 U.S.C. § 1189 ............................................................................................................................. 5, 7
18 U.S.C. § 2339A, 2339B ................................................................................. 7, 17, 27, 28,29
22 U.S.C. § 2371 ............................................................................................................................ 17, 29
22 U.S.C. § 2780 ............................................................................................................................ 17, 29
28 U.S.C. § 1350 ..................................................................................................................................... 5
28 U.S.C. § 1605(a) ...................................................................................................................... 29, 37
28 U.S.C. § 1605A ..................................................................................................................... passim
28 U.S.C. § 1608 ......................................................................................................................... passim
50 U.S.C. § 1701, 1702 .......................................................................................................................... 7
50 U.S.C. § 4605(j) ....................................................................................................................... 17, 29
Cal. Civ. Proc. Code § 377.30 (West) ................................................................................................ 38
D.C. Code Ann. § 12-101 (West) ....................................................................................................... 38
PL 115-253 ................................................................................................................................................ 5

## Rules

Fed. R. Evid. 201 ........................................................................................................................ passim

## Regulations

31 C.F.R. § 594.310 ................................................................................................................................ 5
31 C.F.R. § 596.201 (2005) ................................................................................................................. 30

<u>Other Authorities</u>

29 Am. Jur. 2d Evidence § 151 ................................................................ 12

69 Fed. Reg. 28,098 (2004) ................................................................... 29

Prohibiting Transactions With Terrorists Who Threaten To Disrupt the Middle East Peace
   Process,
   60 FR 5079 ........................................................................................ 7

2015 U.S. Dist. LEXIS 9390, *5 (D.D.C. Jan. 27, 2015) .......................... 20

**INTRODUCTION**

On July 20, 2014 the Foreign Terrorist Organization ("FTO") HAMAS committed the terrorist attack that killed Max Steinberg, an American citizen. Max had moved to Israel in September 11, 2012, in part, to help in response to the terror that was being waged in Israel through rocket launches and other acts of terror committed by Hamas which was launching from, and operating through the terror tunnels that Hamas built, in the Gaza Strip. During this time, Hamas was engaged in terrorist plots that intentionally kidnapped, killed and injured American citizens living and visiting Israel through, suicide bombings, kidnappings, shootings and rocket attacks. As an American, Max signed up as a volunteer to serve with the Israeli IDF. He served as a soldier in the Golani Unit. Max was travelling in Gaza City when the armored vehicle in which he was travelling was hit by a rocket shot by a Hamas operative. Plaintiffs, respectfully move this Court to, (1) make independent findings of fact and conclusions of law that Hamas is responsible for the terrorist attack which killed Max Steinberg and injured his near family members; (2) find that pursuant to Fed. R. Evid. 201 it may take judicial notice of prior judgments and adopt the findings of fact and conclusions of law entered in the related cases of *Estate of Botvin v. Islamic Republic of Iran*, 873 F. Supp. 2d 232, 237–38 (D.D.C. 2012); *Roth v. Islamic Republic of Iran*, 78 F.Supp.3d 379 (D.D.C.2015); and *Roth v. Syrian Arab Republic*, No. 1:14-CV-01946-RCL, 2018 WL 4680270, at *18 (D.D.C. Sept. 28, 2018). —as well as numerous other decisions handed down by this court-- regarding providing material support for Hamas during the same time period as to the liability of the Islamic Republic of Iran (hereinafter "Iran") and the Syrian Arab Republic (hereinafter "Syria"), both designated State Sponsors of Terrorism; (3) make independent findings of fact and conclusions of law that Iran provided material support and sponsorship to Hamas during the relevant time period; (4) make independent findings of fact and conclusions of law that, in addition to the material support that the Iran provided to Hamas in furthering attack at issue, Syria

1

also provided independent material support to Hamas which furthered the terror attack at issue; (5) enter Default Judgment against the Iran and Syria as to liability on behalf of all Plaintiffs pursuant to the private cause of action found in 28 U.S.C. § 1605A(c); and (6) find that the Plaintiffs suffered economic loss and damages and make compensatory and punitive damages awards commensurate with the damages evidence presented.

28 U.S.C. § 1608(e) provides that "no judgment by default shall be entered by a court of the United States or of a State against a foreign state, a political subdivision thereof, or an agency or instrumentality of a foreign state, unless the claimant establishes his claim or right to relief by evidence satisfactory to the court." To satisfy this burden, plaintiffs must present evidence concerning their backgrounds and injuries suffered, and also that the Court may take judicial notice of prior findings of fact and evidence. *Taylor v. Islamic Republic of Iran*, 811 F. Supp. 2d 1, 6–7 (D.D.C. 2011). This allows courts to "rely upon the evidence presented in earlier litigation ... without necessitating the formality of having that evidence reproduced." *Murphy v. Islamic Republic of Iran*, 740 F. Supp. 2d 51, 55 (D.D.C. 2010). 28 U.S.C. § 1608(e) does not require any more evidence or higher standard of evidence than the Court would ordinarily receive to render a judgment. *Commercial Bank of Kuwait v. Rafidain Bank*, 15 F.3d 238, 242 (2d Cir. 1994). To evaluate the plaintiffs' proof the court can "accept as true the plaintiffs' uncontroverted evidence." *Estate of Botvin ex rel. Ellis v. Islamic Republic of Iran*, 510 F. Supp. 2d 101, 103 (D.D.C. 2007). Moreover, the plaintiffs may establish their proof by affidavit. *Weinstein v. Islamic Republic of Iran*, 184 F. Supp. 2d 13, 19 (D.D.C. 2002). Accordingly, Plaintiffs submit the sworn Declarations of experts Dr. Ronni Shaked, Dr. Matthew Levitt, and Dr. Chad Staller and the Declarations of family members Stuart Steinberg, Evie Steinberg, Paige Steinberg and Jake Steinberg in further support of their Motion for Default Judgment as to all Defendants.

## PROCEDURAL BACKGROUND

Iran was served on May 16, 2018 with the Complaint, Summons, Notice of Suit, and administrative documents, together with a copy of each translated into Farsi,  by diplomatic means pursuant to 28 U.S.C. § 1608(a)(4). *See* D.E. 12. Having been served, and Iran having failed to answer, Plaintiffs requested that the Clerk of the Court enter default judgment against this defendants. *See* D.E. 13. On July 25, 2018, the Clerk of Court entered default against Iran. *See* D.E. 14.

Syria was served on June 20, 2018 by being served with a copy of the Summons, Complaint, Notice of Suit, and administrative documents by diplomatic means pursuant to 28 U.S.C. § 1608(a)(4). *See* D.E. 15.  Having been served, and Syria having failed to answer, Plaintiffs requested that the Clerk of the Court enter default judgment against this defendant. *See* D.E. 16. On October 15, 2018, the Clerk of Court entered default against Syria.  *See* D.E. 17.

In support of Plaintiffs' Motion for Default Judgment as to all Defendants, Plaintiffs now submit evidence to this Honorable Court which demonstrates that (1) Hamas, a designated Foreign Terror Organization, committed the terrorist attack at issue in this litigation; (2) Iran provided material support to Hamas during the time frame of this attack which furthered Hamas' ability to carry out the attack which proximately caused Plaintiffs' injuries in this action, (3) Syria provided material support to Hamas which furthered Hamas' ability to carry out the attack which proximately caused Plaintiffs' injuries in this action; and (4) each Plaintiff suffered damages as a result of the terrorist attack at issue in this litigation  entitling them to an award of both compensatory and punitive damages from this Court.

The Plaintiffs respectfully move and pray this court will enter Judgment, jointly and severally as to liability of Defendants Iran and Syria and award them compensatory and punitive damages commensurate with the injuries and resultant damages they each have suffered.

## ARGUMENT

## I. THE FSIA REQUIREMENTS FOR LIABILITY UNDER 28 U.S.C. § 1608(e) ARE EASILY MET

In order to establish subject matter jurisdiction in a default setting, Plaintiffs need to demonstrate "that the foreign state was designated a state sponsor of terrorism; that the claimant or victim was a U.S. national, service member, or government employee at the relevant time; and that, in certain circumstances, the foreign state was given a chance to arbitrate. *Owens v. Republic of Sudan*, CA 08-1361, (JDB) 2016 U.S. Dist. LEXIS 37464, at *89 (D.D.C. 2016) (*citing* 28 U.S.C. § 1605A(a)(2)(A)(i)-(iii)). As described below, both sovereign Defendants were listed by the US Department of State as state sponsors of terrorism at the time of the attacks; and both remain so listed. And as alleged in the Complaint, (Compl. ¶ 9-13) and confirmed by the Declarations of the Steinberg family members filed contemporaneously with this Memorandum, all Plaintiffs were United States citizens when this Hamas terrorist attack occurred. Finally, the requirement to arbitrate the claim prior to the initiation of this lawsuit does not apply where, as here, the immediate acts causing the death of the decedent, occurred in Israel and not in Syria or Iran. *See* 28 U.S.C. § 1605A(a)(2)(A)(iii).

Plaintiffs also need to demonstrate a "plausible claim" that Defendants provided "material support" for the murder of or injury to Plaintiffs. *Id. citing Agudas Chasidei Chabad of U.S. v. Russian Fed'n*, 528 F.3d 934, 940 (D.C. Cir. 2008). 28 U.S.C. § 1605A(a) provides that a foreign state shall not be immune from the jurisdiction of U.S. courts in cases where plaintiffs seek money

damages for personal injury or death caused by hostage taking, torture, or extrajudicial killing, if

the damages were caused by:

(1) the provision of "material support or resources" for hostage taking, torture, and extrajudicial killing; or

(2)  if the provision of material support was engaged in by an official while acting within the scope of his office;

28 U.S.C. § 1605A(a)(1), (a)(2).

The FSIA terrorism exception defines extrajudicial killing to have the meaning given those

terms in section 3 of the Torture Victim Protection Act of 1991 (28 U.S.C. § 1350 note) ("TVPA").

28 U.S.C. § 1605A(h)(7).  The TVPA defines "extrajudicial killing" as a "deliberated killing not

authorized by a previous judgment pronounced by a regularly constituted court affording all the

judicial guarantees which are recognized as indispensable by civilized peoples. Such term,

however, does not include any such killing that, under international law, is lawfully carried out

under the authority of a foreign nation."[1]  28 U.S.C. § 1350.  Here, the attack was committed by

Hamas, a Specially Designated Terrorist organization, *see supra* II (A) and was a deliberate

terrorist attack that was not authorized by an international body.  *See Fritz v. Islamic Republic of*

*Iran*, 320 F. Supp. 3d 48, 83 (D.D.C. 2018)(Iran held liable for the kidnapping and torture of

soldiers in terrorist attack committed by terrorist organization, Asaib Ahl al-Haq)

---

[1]To the extent that this Court might consider Hamas to be part of a military force of a foreign nation, to which the Plaintiffs would object, the recent adoption of the Anti-Terrorism Clarification Act of 2018 ("ATCA") might provide further guidance to the Court.  While the ATCA addresses incongruities relating to the Anti-Terrorism Act, the recent amendments passed by Congress and signed into law make clear that Congress and the Executive consider that a "military force" cannot include a foreign terrorist organization designated by the Secretary of State under section 219 of the Immigration and Nationality Act (8 U.S.C. § 1189); or "(ii) specially designated global terrorist (as such term is defined in 31 C.F.R. § 594.310) by the Secretary of State or the Secretary of the Treasury".  Anti-Terrorism Clarification Act of 2018, PL 115-253, October 3, 2018, 132 Stat 3183.  As Hamas has been a designated SDGT since 1995 it cannot claim to be a legitimate military force of any kind.

As described below, there is substantial evidence submitted by Plaintiffs regarding Iran's liability, including but not limited to the many judicial decisions finding that Iran supported Hamas at the time of the attack in this case. *Infra*, at III. B. 20. Plaintiffs also submit evidence and previous judicial decisions regarding Syrian support for Hamas at the relevant times in this case, support that is more than sufficient for the Court to make a finding of liability here. *Infra*, at IV. C. 34. And there is no doubt that the Iranian and Syrian agents or employees who engaged in this support did so as a part of the official policy of their respective governments. *Infra*, at III. A. 16. and IV. B. 32.

28 U.S.C. § 1605A(c) complements the jurisdictional grant in Section 1605(A)(a) by providing a private right of action to recover damages for state-sponsored terrorism:

> (c) Private Right of Action-A foreign state that is or was a state sponsor of terrorism ... shall be liable to-(1) a national of the United States ... or (4) the legal representative of [such] a person, for personal injury or death caused by acts described in subsection (a)(1) [i.e., the provision of material support or resources for hostage taking, torture, or extrajudicial killing].... In any such action, damages may include economic damages, solatium, pain and suffering, and punitive damages. In any such action, a foreign state shall be vicariously liable for the acts of its officials, employees, or agents.

28 U.S.C. § 1605A(c). Under § 1605A(c), U.S. citizens who are victims of state-sponsored terrorism can sue a responsible foreign state directly for the provision of material support for "torture" or "extrajudicial killing". *See* 28 U.S.C. § 1605A(a)(1). Plaintiffs must prove their causes of action and entitlement to damages under 28 U.S.C. § 1605A(c) to the Court or special master that the Court deems acceptable, after Plaintiffs meet their burden at this procedural stage.

## II.     HAMAS' RESPONSIBILITY FOR THE TERRORIST ATTACK WHICH KILLED MAX STEINBERG.

### A.   Evidence and Expert Testimony Establish that Hamas is the Responsible Terrorist Organization for the July 20, 2014 Attack.

Hamas, enabled by Iran and Syria's material support, carried out the July 20, 2014 terror attack that killed Max Steinberg.  Hamas, which is an acronym for Harakat al-Muqawama al-Islamiya (Islamic Resistance Movement), is a Palestinian Islamist group that emerged in 1987. *See* Expert Declaration of Dr. Ronni Shaked in Support of Plaintiffs' Motion for Default Judgment at p.9, ¶34[2], attached hereto as Exhibit A (hereinafter "Shaked Decl.").  Hamas sanctifies Jihad as the sole method of action to destroy the State of Israel. Article 13 of the Hamas Charter emphasis: "There is no solution to the Palestinian problem except by Jihad." *Id.*

In 1995, the United States Government designated Hamas as a "Specially Designated Terrorist" entity pursuant to the International Emergency Economic Powers Act. *Id* at ¶ 37.  50 U.S.C. § 1701, 1702; Prohibiting Transactions With Terrorists Who Threaten To Disrupt the Middle East Peace Process, 60 FR 5079.  Only two years later, Hamas was identified and labeled as a "Foreign Terrorist Organization," pursuant to 8 U.S.C. § 1189. *Id.*  In 2001, the United States government designated Hamas a Specially Designated Global Terrorist ("SDGT").  *Id.* It is unlawful to provide material support and resources, including currency or monetary instruments, financial services, personnel, transportation, and other provisions to any components of a Foreign Terrorist Organization. *Id.*; *See* 18 U.S.C. § 2339A, 2339B.

In June 2007 Hamas took over the Gaza Strip, and established a radical Islamic entity in the Gaza Strip which is separate from the Palestinian Authority in the West Bank. Id. at ¶ 37.  Since then, the Gaza Strip is controlled by the terrorist regime of Hamas.  *Id.*  Hamas is a proxy for Iran

---

[2] Plaintiffs request that this Court, as it has in the past, find Dr. Ronni Shaked as a qualified expert under the Federal Rules for purposes of testifying on Hamas and its responsibility for the Steinberg attack.  Most recently, this Court qualified Dr. Shaked as an expert on Hamas in the matter of *Baxter v. Islamic Republic of Iran*, No. 11-cv-02133 at (D.D.C. 2011) at a hearing held on July 18, 2019. Dr. Shaked holds both a Masters degree in Middle Eastern Studies and a Ph.D in Middle Eastern and Social Psychology from Hebrew University, is the Head of the Department in Middle Eastern Studies at Hebrew University in Jerusalem, and has extensive experience spanning over two decades. As detailed in Dr. Shaked's Decl., Dr. Shaked has provided expert testimony in this Court and others about international terrorism, militant Islam and terrorist organizations such as Hamas.  He has been qualified as an expert and provided expert testimony in U.S. federal court proceedings.  Ex. A.

and at various times has also received support for its terrorist activities from the Syrian Arab Republic. *Id.* At the same time, Hamas has continued its accelerated terrorist buildup, and terrorizes Israel through routine terrorist activities of launching rockets, missiles, mortar shell fire, light arms fire, planting IEDs dispatching suicide bombers and other acts of terror targeting Israel. *Id.*

The Hamas' terrorist strength rests on the Izz al-Din al-Qassam Brigades, its "military wing", used as the movement's apparatus for carrying out terror attacks. *Id.* at ¶38. The Izz al-Din al-Qassam Brigade was founded in 1990, in order to plan and carry out the "Jihad" - terrorist attacks against Israel. *Id.* Izz Al-Din Al-Qassam Brigades comprises six units, with an estimated 30,000 terrorists divided into units and battalions. *Id.* at ¶41. Each unit has defined missions. The most prominent terrorist units are the Infantry Unit; the artillery; the engineering; the anti-tank; air defense; the sniper and information bureau. *Id.* By July 2014, Izz Al-Din Al-Qassam Brigades arsenal was estimated at approximately 10,000 rockets. *Id.* The long-range missiles came mainly from Iran and Syria. *Id.*

Since its founding in 1987, Hamas has launched thousands of attacks, and murdered and injured thousands of civilians. *Id.* at ¶43. Israel has taken counter-terror activities and all defensive measures, including the construction of a separation fence between Gaza and Israel and also between the West Bank and Israel. *Id.* at ¶44. These measures led to a significant decrease in Hamas' success in carrying out suicide attacks in Israel. As a result, Hamas, and other Palestinian terrorist organizations were forced to look for new ways to carry out terrorism inside Israel. *Id.* One of the ways which Hamas has attempted to bypass the fence barrier and the wall was the construction of a vast underground system which includes a network of tunnels dug under various regions of the Gaza Strip. *Id.* at ¶45. These tunnels were designed to infiltrate the State of Israel

to commit attacks upon Israeli citizens and the many American and other residents of and visitors to Israel. *Id*.  To promote terrorism through the tunnels, Hamas set up the Nuchba unit.  *Id*. at ¶42. This unit, which has several hundred terrorists, is considered an elite unit of the Izz Al-Din Al-Qassam Brigades. *Id.*

Offensive tunnels constituted the major offensive capability of Hamas.  *Id*. at ¶46.  In 2014 the IDF discovered 36 offensive tunnels in the course of operations, fourteen of which reached into Israel and two more had exits within 500 meters (about 0.31 miles) of the Israeli border. *Id*.

The date of June 12, 2014 marked another record of Hamas terrorism escalation, and the threat to Israel reached a critical point: three teenagers were kidnapped and murdered by Izz Al-Din Al-Qassam terrorists. *Id*. at ¶43.  At the same time, heavy rocket fire began to launch on Israel from the Gaza Strip, Hamas intensified its rocket and mortar launches towards Israel, firing on an almost daily basis, and simultaneously Hamas' terrorists intensified their infiltrated attacks into Israel through the offensive tunnels they built to murder residents and try to kidnap civilians and soldiers. *Id.*  On July 7, 2014, over 60 rockets were launched at Israel from the Gaza Strip. Israel responded with an aerial campaign. *Id.* at ¶53.  Ten days later, on July 17, 2014, Hamas conducted a major infiltration into Israeli territory through a cross-border assault tunnel.  *Id.*  As a result, and in order to prevent additional attacks, a counter-terror ground operation was launched against Hamas known as "Operation Protective Edge". *Id.*  The major objective of Operation Protective Edge was to locate terrorist tunnels on the Gaza side of the border, and to identify and neutralize the cross-border offensive tunnels, which originated from the outskirts of the urban areas of the Gaza Strip. *Id.* The operation took place in several limited areas on the outskirts of Gaza, where Hamas was suspected of operating the tunnels. *Id.* One of the locations was Saja'iya neighborhood. *Id*.

9

The Saja'iya neighborhood is the eastern neighborhood of Gaza City, located a few hundred meters from the border with Israel. *Id.* at ¶ 54. About 100,000 people live in the neighborhood which is considered the main stronghold of the Hamas terrorist movement, therefore it is called "the terror neighborhood". *Id.* In the neighborhood there are many facilities of Hamas, among them several Hamas training facilities and centers of Islamic education. *Id.* Hamas exploited the residents' support, and the population density of the neighborhood in order to create a "human shield" for its terrorist activities, thus reducing or complicating Israel's willingness and ability to strike them. *Id.* Hamas dug many tunnels in the neighborhood, also because it is located not far from the border fence. *Id.*

On July 20, 2014, Max Steinberg was killed when his Israeli armored troop carrier entered the outskirts of the Saja'iya neighborhood and was attacked. *Id.* at ¶ 56. The vehicle became stuck a few dozen meters from a two story house where terrorists from Al-Din Al-Qassam Brigades were hiding inside. *Id.* The terrorists ambushed the armored convoy, and when they noticed that the one of the vehicles was stuck and stalled, they took the advantage and launched RPG missiles that hit the carrier. *Id.* As a result, Max Steinberg and six other members from his unit were killed. *Id.* Immediately afterwards, the terrorists ambushed the burning carrier and kidnapped the dead body of Shaul Oron, a member of Max's unit who was in the armored vehicle with Max. *Id.* at ¶ 57. From Hamas' point of view, kidnapping the body of Oron, was the most important success. *Id.*

A few hours after the attack, even before all the details became clear, Izz al-Din al-Qassam Brigades, issued a statement announcing and taking responsibility for the attack. *Id.* at ¶ 58. This claim of responsibility was distributed through the Al-Qassam official website. *Id.* According to the announcement, "fighters of the Izzadin Al-Qassam Battalions were able to ambush an armored carrier". *Id.* A few hours after launching the RPG missile in which Max was killed and the

kidnapping of Shaul Oron's body from the armored vehicle, the official spokesman of the Izz al-Din al-Qassam Brigades, known by his nickname 'Abu Obeida', gave an official statement to the press[3], announcing that Hamas was holding an Israeli soldier captive. *Id.* at ¶ 59. He mentioned the name of Shaul Oron and gave his personal details.[4] *Id.* The spokesman announced that Oron had been taken captive by the Izz Adin Al-Qassam Brigades. *Id.* The official announcement was videotaped and was sent to all Palestinian Arab and international media. Abu Obeida wore military clothes. *Id.* On his head he wore a Kaffia that covered his face, on his forehead was a green bandana on which was written 'Izz al-Din al-Qassam', in the background of the pictures appeared a Hamas flag and the official emblem of the Izz Adin al-Qassam Brigades. *Id.* In addition, the Izz al-Din al-Qassam Brigades official website report about the attack, reported that they captured an Israeli soldier, and claimed responsibility for this attack.[5] *Id.* at ¶ 60. The announcement mentions the name of Golani Brigade, the unit in which Max was serving. *Id.* The next day, all Palestinian newspapers and Arabs newspapers in Jordan, Egypt, the Persian Gulf Emirates, and Iran published the announcement. *Id.* at ¶ 61. Hamas' narrative of the kidnapping of the soldier and the destruction of the armored vehicle was adopted by both the Palestinian and Arab public opinion. *Id.* Apart from Hamas, no other Palestinian terrorist organization has claimed responsibility for the attack. *Id.* at ¶ 64. Official sources in Israel, the Prime Minister's Office, the Foreign Ministry and including the IDF Spokesman confirmed that Hamas carried out the terrorist attack. *Id.* at ¶ 65.

Based on Dr. Shaked's research and methodology, which has been previously testified to and accepted by this Court and which Dr. Shaked utilized and applied for analyzing and investigating the July 20, 2014 terrorist attack that killed Max Steinberg, there is "no doubt that

---

[3] https://www.youtube.com/watch?v=bDIxcAWIYgQ (the announcement was broadcast in Al-Jazira television)
[4] https://www.youtube.com/watch?v=blvSFGQmDcw  ;  https://www.youtube.com/watch?v=l92Bqy0czhU
[5] http://www.qassam.ps/news-8667-
In_the_ground_war_on_Gaza_Al_Qassam_captures_Israeli_soldier__kills_52.html

the terrorist attack in which Max Steinberg was killed was carried out by the Izz Adin al-Qassam

Brigades, the Hamas terrorist branch" and there is "conclusive proof that Hamas is responsible for

the killing of Max Steinberg." *Id.*

**B.   Under Fed. R. Evid. 201, This Court Can Take Judicial Notice Of Previously-Rendered Conclusions Of Facts And Law That Establish Hamas' Liability For Acts Of Terrorism.**

    **1.   Under Fed. R. Evid. 201, this Court may take judicial notice of findings of fact and conclusions of law, including those in judicial records.**

In this case, the Court "may take judicial notice of related proceedings and records in cases

before the same court" and examine other cases in this Court which issued judgments based upon

Hamas' responsibly for murder and injuries of U.S. citizens.  Fed. R. Evid. 201 allows courts to

take judicial notice of adjudicative facts "not subject to reasonable dispute." Fed. R. Evid. 201(b);

*see Opati v. Republic of Sudan*, 60 F. Supp. 3d 68, 73 (D.D.C. 2014) (stating "[c]ourts in this

district have done so frequently in the FSIA context.") *citing Booth v. Fletcher*, 101 F.2d 676, 679

n.2 (D.C. Cir. 1938); 29 Am. Jur. 2d Evidence § 151.  Facts not subject to reasonable dispute

include those (1) that are "generally known within the trial court's territorial jurisdiction," or (2)

which "can be accurately and readily determined from sources whose accuracy cannot reasonably

be questioned." Fed. R. Evid. 201(b).  It is well established in this circuit that courts may reach

their own independent findings of fact based on judicial notice of evidence presented in earlier

related proceedings.  *Opati*, 60 F. Supp. 3d at 73 (granting a motion for default judgment where

plaintiffs "rely solely" on "judicial notice of related proceedings and records in cases before the

same court.") (*quoting Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 59 (D.D.C. 2010));

*see also Estate of Botvin*, 873 F. Supp. 2d at 237 ("the proper approach is one 'that permits courts

in subsequent related cases to rely upon the evidence presented in earlier litigation . . .  without

necessitating the formality of having that evidence reproduced.'") (*quoting* Murphy, *740 F. Supp.*

*2d at 58*). Indeed, the court in *Opati* was correct in pointing out that "in the FSIA context" the courts of this circuit frequently take judicial notice of evidence presented in past judicial proceedings. *Opati*, 60 F. Supp. 3d at 73.[6]

This Court can always take judicial notice of evidence in the judicial records of related cases because "the judicial records 'establishing the type and substance of evidence that was presented to earlier courts' [are] 'not subject to reasonable dispute.'" *Opati*, 60 F. Supp. 3d at 73 (*quoting Rimkus v. Islamic Republic of Iran*, 750 F. Supp. 2d 163, 172 (D.D.C. 2010) *citing* Fed. R. Evid. 201(b); *Oveissi*, 879 F. Supp. 2d at 50; *Valore*, 700 F. Supp. 2d at 59; *see Booth*, 101 F.2d at 679 ("A court may take judicial notice of, and give effect to, its own records in another but interrelated proceeding . . . ."). "The objective issue of what the evidence was—rather than the subjective determination of what the evidence means—is thus a proper exercise of judicial notice." *Rimkus*, 750 F. Supp. 2d at 172.

---

[6] *See, e.g.*, *Spencer v. Islamic Republic of Iran*, 922 F. Supp. 2d 108, 109 (D.D.C. 2013) ("Courts may also take judicial notice of evidence presented in other related cases, including those where defendants failed to enter an appearance.") *citing Valore*, 700 F. Supp. 2d at 59; *Estate of Buonocore v. Great Socialist People's Libyan Arab Jamahiriya*, No. CIV.A. 06-727 JMF, 2013 WL 351610, at *71 (D.D.C. Jan. 29, 2013) *vacated in part and modified in part*, *Estate of Buonocore v. Great Socialist People's Libyan Arab Jamahiriya*, No. CIV.A. 06-727 JMF, 2013 WL 653921 (D.D.C. Mar. 13, 2013); *Oveissi v. Islamic Republic of Iran*, 879 F. Supp. 2d 44, 49 (D.D.C. 2012) ("Finally, a FSIA court may 'take judicial notice of related proceedings and records in cases before the same court.'"); *Estate of Brown v. Islamic Republic of Iran*, 872 F. Supp. 2d 37, 40 (D.D.C. 2012) (accepting "the issue of liability as [having] been [entirely] settled" by the court's judicial notice of "the findings of fact and conclusions of law in [a previous case] with respect to all issues of liability"); *Wultz v. Islamic Republic of Iran*, 864 F. Supp. 2d 24, 29 (D.D.C. 2012); *Fain v. Islamic Republic of Iran*, 856 F. Supp. 2d 109, 115 (D.D.C. 2012) ("Because of the multiplicity of FSIA-related litigation, courts in this District have frequently taken judicial notice of earlier, related proceedings."); *Certain Underwriters at Lloyd's London v. Great Socialist People's Libyan Arab Jamahiriya*, 811 F. Supp. 2d 53, 73 (D.D.C. 2011); *Taylor*, 811 F. Supp. 2d at 6; *Estate of Doe v. Islamic Republic of Iran*, 808 F. Supp. 2d 1, 15 (D.D.C. 2011) ("The FSIA does not require this Court to re-litigate issues that have already been settled"); *Haim v. Islamic Republic of Iran*, 784 F. Supp. 2d 1, 6 (D.D.C. 2011); *Baker v. Socialist People's Libyan Arab Jamahirya*, 775 F. Supp. 2d 48, 77 (D.D.C. 2011); *Valencia v. Islamic Republic of Iran*, 774 F. Supp. 2d 1, 7 (D.D.C. 2010); *Oveissi v. Islamic Republic of Iran*, 768 F. Supp. 2d 1, 6 (D.D.C. 2010); *Anderson v. The Islamic Republic of Iran*, 753 F. Supp. 2d 68, 75 (D.D.C. 2010); *Ben-Rafael v. Islamic Republic of Iran*, 718 F. Supp. 2d 25, 31 (D.D.C. 2010) ("After all, 'courts have an interest [in] promoting uniformity of determinations with respect to the liability of foreign states for the terrorist acts of its officials, agents, and employees.'"); *Brewer v. Islamic Republic of Iran*, 664 F. Supp. 2d 43, 54 (D.D.C. 2009); *Estate of Heiser v. Islamic Republic of Iran*, 466 F. Supp. 2d 229, 263 (D.D.C. 2006); *Prevatt v. Islamic Republic of Iran*, 421 F. Supp. 2d 152, 155 (D.D.C. 2006) (taking judicial notice of "findings made in a prior case arising from the same attack.").

**2. This Court may render a liability judgment against FSIA defendants either by reviewing evidence considered in an opinion that is judicially noticed, or by adopting previous findings of fact and conclusions of law.**

In more than a dozen terrorism exception cases, this Court rendered default judgment against FSIA defendants by finding facts and making legal conclusions anew based on the evidence considered in judicially noticed opinions. *See supra* note 6. "A court clearly may judicially notice its findings of facts and conclusions of law in related cases . . . . [a]t issue is the effect of such notice." *Valore*, 700 F. Supp. 2d at 59. Even though "courts generally cannot take notice of findings of fact from other proceedings *for the truth asserted therein* because these are disputable and usually are disputed  . . . the FSIA does not require this Court to relitigate issues that have already been settled" in previous decisions." *Murphy*, 740 F. Supp. 2d at 58 (emphasis added). "Instead, the Court may review evidence considered in an opinion that is judicially noticed, without necessitating the re-presentment of such evidence." *Id.*

And the Court may rely on the findings of different judges in the same court, in cases based upon different terrorist attacks, as long as the same material-support-relationship is at issue. In *Brewer v. Islamic Republic of Iran*, using Fed. R. Evid. 201, Judge Ellen Huvelle, "[r]elying on the pleadings and the above findings of other judges in this jurisdiction [Judge Thomas Penfield Jackson and Magistrate Judge Alan Kay]," concluded "that defendants provided 'material support and resources' to Hezbollah in carrying out the September 20, 1984 attack on the Embassy Annex in East Beirut." *Brewer*, 664 F. Supp. 2d at 54 *citing* to *Wagner v. Islamic Republic of Iran*, 172 F. Supp. 2d 128, 134 (D.D.C. 2001); *Welch v. Islamic Republic of Iran*, No. 01-863, 2007 U.S. Dist. LEXIS 99191 (D.D.C. Sept. 20, 2007)). Furthermore, the court in *Brewer* supported this ruling by examining at least one case regarding a completely different terrorist attack, but which also revolved around the question of Iranian support for Hezbollah: "Defendants' connections to

14

Hezbollah have been explored at length in this jurisdiction, and it has uniformly been agreed that in the relevant time period, Hezbollah received substantial funds and support from Iran via its Ministry of Information and Security and the Iranian Revolutionary Guard Corps." *Brewer*, 664 F. Supp. 2d at 54 *citing Ben-Rafael v. Islamic Republic of Iran*, 540 F. Supp. 2d 39, 47 (D.D.C. 2008) and *Dammarell v. Islamic Republic of Iran*, 404 F. Supp. 2d 261, 270–71 (D.D.C. 2005)). The *Brewer* court explained its use of Fed. R. Evid. 201 to examine the wide range of prior opinions regarding Iran's support for Hezbollah because all the decisions issued from the same court: "this Court 'may take judicial notice of related proceedings and records in cases before the same court.'" *Brewer*, 664 F. Supp. 2d at 54 (*quoting Estate of Heiser*, 466 F. Supp. 2d at 263).

Moreover, in FSIA litigation concerning terrorist attacks, on numerous occasions this Court has gone one step further and found that a foreign terrorist organization committed an act of terrorism based solely on "adopting" prior decision's findings of fact and conclusions of law "in their entirety." *See, e.g.*, *Oveissi*, 768 F. Supp. 2d at 7; *Estate of Brown*, 872 F. Supp. 2d at 40 (accepting "the issue of liability as [having] been [entirely] settled" by the court's judicial notice of "the findings of fact and conclusions of law in [a previous case] with respect to all issues of liability"); *Ben-Rafael*, 718 F. Supp. 2d at 31 ("Based on prior [findings and holdings] in *Ben-Rafael*, 540 F. Supp. 2d at 43–51, the Court reaffirms its ruling that plaintiffs here established their claims "by evidence satisfactory to the court" and reenters default judgment as to defendant Iran."); *Brewer*, 664 F. Supp. 2d at 54.

In addition, this Court has specifically found that Hamas committed certain acts of terrorism based on judicially-noticed findings of fact and conclusions of law drawn from prior decisions. *See, e.g.*, *Roth v. Islamic Republic of* Iran, 78 F.Supp.3d 379, 387-88 (D.D.C.2015) (taking judicial notice of evidence received in *Greenbaum v. Islamic Republic of Iran*, 451 F. Supp.

2d 90, 95 (D.D.C. 2006) and in *Campuzano v. Islamic Republic of Iran*, 281 F. Supp. 2d 258 (D.D.C. 2003) to find that Hamas committed the act of terrorism at issue); *Bodoff v. Islamic Republic of Iran*, 907 F. Supp. 2d 93, 96, 103 (D.D.C. 2012) (taking judicial notice of facts found in a prior proceeding to find that Hamas was responsible for a bus bombing); *Beer v. Islamic Republic of Iran*, 2010 U.S. Dist. LEXIS 129953, at *7–8, *9 (D.D.C 2010) (concluding, "[b]ased on judicial notice of" evidence presented in a prior proceeding that was not in "reasonable dispute," that Hamas committed the bus bombing at issue).

The *Steinberg* case is related to at least three cases where the court has rendered a decision finding Iran liable for terrorist murders and injuries as a result of its material support of Hamas; *Estate of Botvin*, 873 F. Supp. 2d at 237–38 and *Roth v. Islamic Republic of Iran*, 78 F.Supp.3d 379, 388 (D.D.C.2015). In addition, in *Bluth v. Islamic Republic of Iran*, 203 F. Supp. 3d 1 (D.D.C. 2016) the Court found that Hamas had committed the attack which injured Mr. Bluth, and held Iran liable for the injuries sustained by Mr. Bluth as a result of the material support that Iran provided to Hamas.

Similarly, the Steinberg case is also related to cases where the court has found Syria liable for murders and injuries as a result of its material support of Hamas. *Roth*, 2018 WL 4680270, at *18.

## III.    THE ISLAMIC REPUBLIC OF IRAN IS LIABLE FOR SUPPORTING HAMAS

### A.  Iran Provided Hamas With Logistical and Financial Support to Enable it to Commit the Terrorist Attacks which Killed Max Steinberg.

Plaintiffs' expert Dr. Matthew Levitt[7] and in the Report of Dr. Matthew Levitt attached hereto as Exhibit B (hereinafter "Levitt Rep."), and incorporated herein by reference, explains that

---

[7] Plaintiffs request that this Court, as it has in the past, find Dr. Matthew Levitt as a qualified expert under the Federal Rules for purposes of testifying to Hamas and Iran's support of Hamas. Dr. Levitt holds both a Masters of Law and

Hamas had and in 2014 continued to receive material support from Iran. Levitt Report, p.27. Moreover, the U.S. State Department's *Country Reports on Terrorism 2014* notes that Iran is not shy about its willingness to finance Hamas. *Id.* "Since the conclusion of [Operation Protective Edge]," the report notes, "Iranian governmental officials have publicly stated their willingness to resume Iran's military support of Hamas." The report goes on to note that "historically, Hamas has received funding, weapons, and training from Iran."[8]

A "state sponsor of terrorism" refers to a country whose government the United States Secretary of State has determined, for purposes of Section 6(j) of the Export Administration Act of 1979, (50 U.S.C. § 4605(j)), Section 620A of the Foreign Assistance Act of 1979, (22 U.S.C. § 2371), Section 40 of the Arms Export Control Act, (22 U.S.C. § 2780), or any other provision of law, "is a government that has repeatedly provided support for acts of international terrorism," 28 U.S.C. § 1605A(h)(6); *see also* "Terrorist Groups," U.S. Department of State, https://www.nctc.gov/site/groups.html; *see e.g.*, *Bluth*, 203 F. Supp. 3d 1. Iran has been identified as a state sponsor of terrorism since January 19, 1984. *See e.g.*, *Moradi v. Islamic Republic of Iran*, 77 F. Supp. 3d 57, 65 (D.D.C. 2015) (citations omitted).

Hamas has historically received significant financial and other support—especially training—from Iran. Levitt Report, p.27. Iranian officials themselves admit Tehran continues

---

Diplomacy (MALD) and a Ph.D. in International Relations from The Fletcher School of Law and Diplomacy at Tufts University, and has extensive experience spanning over two decades. As detailed in Dr. Levitt's Decl. and Curriculum Vitae attached thereto, Dr. Levitt has provided expert testimony in this Court, the United States Senate and House of Representatives to provide testimony on international terrorism, militant Islam and terrorist financing. He has been qualified as an expert and provided expert testimony in U.S. federal court proceedings. Ex. A. Dr. Levitt's methodology has been described as "the gold standard in the field of international terrorism" by a U.S. federal district court. *United States v. Damrah*, 412 F.3d 618, 625 (6th Cir. 2005). The Supreme Court also cited his book on Hamas and its Iranian state-sponsorship in a decision regarding the constitutionality of 18 U.S.C. § 2339B and its prohibition on the provision of material support or resources to designated foreign terrorist organizations. *Holder v. Humanitarian Law Project*, 561 U.S. 1, 130 S. Ct. 2705, 2725, 177 L. Ed. 2d 355 (2010).

[8] "Country Reports on Terrorism 2014," United States Department of State, Bureau of Counterterrorism, Released June 2015, http://www.state.gov/documents/organization/239631.pdf

to support Hamas. *Id.*.  In March 2014, the head of the Iranian Shura Council, Ali Larijani, said: "Iran is supporting Hamas on the grounds that it is a resistance movement…Our relationship with [Hamas] is good and has returned to what it was. We have no problems with [Hamas]." [9] *Id.*   In August 2014, as the conflict between Hamas and Israel escalated, Brigadier General Mohammad Reza Naqdi, commander of Iran's volunteer Basij force, confirmed to Fars News Agency that, "[m]uch of the arms Hamas deployed 'were the products of the Islamic Republic of Iran.'" [10] *Id.* According to a November 2015 Congressional Research Service report on Iran's foreign policy, "[s]uccessive annual State Department reports on terrorism have stated that Iran gives Hamas funds, weapons, and training." [11]. *Id.*

Based on his expert research, Dr. Levitt is able to opine that Iran provided continuous funding for Hamas's military wing.  *Id.* at 29.  Indeed, according to the State Department's annual money laundering and financial crimes report, in 2013 Iran continued "to provide material support, including resources, guidance, and financial assistance to multiple terrorist organizations that undermine the stability of the Middle East and Central Asia, such as Hamas, Lebanese Hezbollah, the Taliban, and Iraqi Shia militias." [12] *Id.* Such support continued in 2014, according to the next year's report.  *Id.*   "Hamas, Lebanese Hezbollah, and the Palestinian Islamic Jihad (PIJ) maintain representative offices in Tehran," the State Department report noted, "in part to help coordinate Iranian financing and training." [13] *Id.* In a section of the report on

---

[9] http://www.al-monitor.com/pulse/originals/2014/03/iran-hamas-finance-economy-resistance-axis-gaza.html

[10] http://freebeacon.com/national-security/iran-begins-arming-palestinian-terrorists/

[11] https://www.fas.org/sgp/crs/mideast/R44017.pdf

[12] International Narcotics Control Strategy Report, Vol II: Money Laundering and Financial Crimes, United States Department of State, Bureau for International Narcotics and Law Enforcement Affairs, March 2014, http://www.state.gov/j/inl/rls/nrcrpt/2014/vol2/index.htm

[13] International Narcotics Control Strategy Report, Vol II: Money Laundering and Financial Crimes, United States Department of State, Bureau for International Narcotics and Law Enforcement Affairs, March 2015, http://www.state.gov/documents/organization/239561.pdf

actions taken against Iran under U.S. Executive Orders, the report noted actions taken against

Iran's Martrys Foundation, "an Iranian parastatal organization that channels financial support

from Iran to several terrorist organizations in the Levant," including Hamas.[14] *Id.* at 30.

According to the US State Department, Iranian state sponsorship of Hamas is critical not

only in terms of providing the material and funds with which to carry out terrorist operations, but

also the rhetorical support necessary to keep up the pace of such operations:

> During 2003, Iran maintained a high-profile role in encouraging anti-Israeli
> activity, both rhetorically and operationally. Supreme Leader Khamenei
> praised Palestinian resistance operations, and President Khatami reiterated Iran's support
> for the "wronged people of Palestine" and their struggles. Matching this rhetoric
> with action, Iran provided Lebanese Hizballah and Palestinian rejectionist groups—
> notably HAMAS, the Palestine Islamic Jihad, and the Popular Front for the
> Liberation of Palestine–General Command—with funding, safe haven, training,
> and weapons. Iran hosted a conference in August 2003 on the Palestinian intifadah,
> at which an Iranian official suggested that the continued success of the Palestinian
> resistance depended on suicide operations.

*Patterns of Global Terrorism 2003, U.S. State Department, "Overview of State Sponsored*

*Terrorism," http://www.state.gov/documents/organization/31944.pdf* at 88.  This relationship has

continued over time.  According to a 2010 U.S. Department of Defense report on Iran's military

power, Iran provides Hamas and other Palestinian terrorist groups "with funding, weapons, and

training to oppose Israel and disrupt the Middle East Peace Process." *Unclassified Report on*

*Military   Power   of   Iran   April   2010,*   U.S.   Department   of   Defense,

https://fas.org/man/eprint/dod_iran_2010.pdf.   The Defense Department report added that Iran's

support for Hamas and other Palestinian terrorist groups, "produced improvements in the groups'

capabilities and increased the threat to Israeli and U.S. interests in the region." *Id.* More generally,

the Defense Department report noted that "Iran continues to supply weapons, money, and weapons

---

[14] International Narcotics Control Strategy Report, Vol II: Money Laundering and Financial Crimes, United States Department of State, Bureau for International Narcotics and Law Enforcement Affairs, March 2015, http://www.state.gov/documents/organization/239561.pdf

components to Palestinian extremist groups that are then smuggled into Gaza through tunnels in the Philadelphia corridor" (which runs along the Gaza-Egypt border). *Id.*

Dr. Levitt also concludes that U.S.-designated State Sponsor of Terrorism Iran has provided a wide range of material support to Hamas, without which Hamas could never have become the capable and deadly terrorist organization it is today. *Id.* at 39.  This critical and massive support enabled Hamas to carry out attacks, to produce and field weapons targeting civilians, and continue to engage in terrorist activity at the expense of the Gaza Strip's civilian population.  *Id.*  It digs tunnels from the Gaza Strip into Israel for the purpose of carrying out terrorist attacks, sometimes targeting soldiers but often civilians, as well.  *Id.*  Accordingly, there is no question that on July 20, 2014, the date that Max Steinberg was murdered, Iran, as a state sponsor of terrorism, continued to materially support Hamas and its terrorist operations.

**B.  Under Fed. R. Evid. 201, This Court Should Take Judicial Notice Of The Numerous Decisions Finding That Iran Materially Supported Hamas In Its Execution Of Acts Of Terrorism.**

As discussed above, under Fed. R. Evid. 201, this Court can take judicial notice of conclusions of liability entered in previous cases. This Court has, on numerous occasions, concluded that Iran (and its Ministry of Information and Security ("MOIS")) was liable for providing various kinds of material support to Hamas for the express purpose of enabling Hamas to launch various terrorist attacks resulting in the injury and/or murder of American citizens. This Court is able to take judicial notice of the following decisions, which enable it to conclude that Iran materially supported Hamas:

1. In *Roth v. Islamic Republic of Iran*, the court found that on August 9, 2001 Hamas detonated a ten-pound bomb at a Sbarro restaurant. Roth, 78 F.Supp.3d 387 (D.D.C. 2015). This Court found Iran liable for the attack because it provided material support to Hamas

as early as 1999. *Id.* at 394 (finding that defendants (1) provided substantial support to Hamas through provision of money and training and (2) encouraged the escalation of terrorist activities, including against Israeli targets; that these acts have a reasonable connection to the at-issue attack ultimately carried out by Hamas; and that this is sufficient to establish proximate cause under the FSIA);

2. In *Goldberg-Botvin v. Islamic Republic of Iran*, the court found that on September 24, 1997, Hamas detonated several cases of powerful explosives at the crowded Ben Yehuda Street pedestrian mall in Jerusalem, Israel. 938 F. Supp. 2d 1, 5 (D.D.C. 2013). This Court found Iran liable for the attack because it provided material support to Hamas as early as the early 1990's. *Id.* at 7, 9 (finding that Iran provided substantial support for Hamas' terrorist activities for the purpose of undertaking attacks in Israel, funneled money and material support to Hamas, and played necessary planning, logistical, and support roles leading up the bombing);

3. In *Estate of Botvin v. Islamic Republic of Iran*, the Court found that on September 24, 1997, Hamas detonated several cases of powerful explosives at the crowded Ben Yehuda Street pedestrian mall. *Estate of Botvin*, 873 F. Supp. 2d at 234. The Court found Iran liable for the attack because it provided material support to Hamas as early as the "early 1990's." *Id.* at 237–38 (finding that Iran provided financial, technical and other material support to Hamas and other terrorist groups, including Hezbollah and the Palestinian Islamic Jihad, at the time of the at-issue bombing in Israel);

4. In *Beer v. Islamic Republic of Iran*, the court found that on June 11, 2003, Hamas detonated a bomb on Egged bus No. 14A in Jerusalem, Israel. *Beer*, 2010 U.S. Dist. LEXIS 129953, at *12. The court found Iran liable for the attack because it provided material support to

Hamas "well before the attack in 2003." *Id.* at 11, *6 (Nov. 9, 2010) ("Beer II") (finding that Iran "routinely provided financial and other assistance to Hamas—constituting material support under the FSIA" which led to Hamas's June 11, 2003 "bombing of Egged bus 14A");

5. In *Wachsman ex rel. Wachsman v. Islamic Republic of Iran*, the court found that in October 1994, Hamas abducted and executed Nachshon Wachsman, a U.S. citizen residing in Israel. *Wachsman ex rel. Wachsman,* 603 F. Supp. 2d 148, 151 (D.D.C. 2009). The court found Iran liable for the attack because it provided material support to Hamas as early as 1992. *Id.* at 154 (finding that Iran's official foreign policy is to support terrorism by providing economic and training support to Hamas, that Iran funnels its financial support through its Ministry of Information and Security, and that Iran provides professional military and terrorist training through its Revolutionary Guard);

6. In *Beer v. Islamic Republic of Iran*, the court found that on June 11, 2003, Hamas detonated a bomb on Egged bus No. 14A in Jerusalem, Israel. *Beer*, 574 F. Supp. 2d 1, 5 (D.D.C. 2008). The court found Iran liable for the attack because it provided material support to Hamas leading up to the 2003 attack. *Id.* at 7, 9 (finding that (1) Iran has been designated a state sponsor of terrorism continuously since January 19, 1984 and was so designated at the time of the at-issue attack in Israel; (2) each of the plaintiffs was a U.S. national at the time the bombing occurred; and (3) Iran knowingly provided material support to Hamas, the entity that committed the at-issue attack in Israel; and treating MOIS as the state of Iran itself so that the same determinations apply to MOIS conduct);

7. In *Kirschenbaum v. Islamic Republic of Iran*, the court found that on December 1, 2001, Hamas detonated a bomb at the Ben Yehuda Street pedestrian mall in Jerusalem, Israel.

*Kirschenbaum*, 572 F. Supp. 2d 200, 204 (D.D.C. 2008). The court found Iran liable for the attack because it had "continuously" provided material support to Hamas. *Id.* at 209, 210 (finding that Iran knowingly provided material support to Hamas, the entity that committed the attack, and treating MOIS as the state of Iran itself so that the same determinations apply to MOIS conduct);

8. In *Bennett v. Islamic Republic of Iran*, the court found that on July 31, 2002, Hamas detonated a bomb at the Frank Sinatra Cafeteria Building on the campus of Hebrew University in Jerusalem, Israel. *Bennett*, 507 F. Supp. 2d 117, 121 (D.D.C. 2007). The court found Iran liable for the attack because it had "continuously" provided material support to Hamas. *Id.* at 123–24 (explaining that Hamas, aka the Islamic Resistance Movement, is an organization supported by Iran dedicated to waging a holy war employing terrorism with the object of seizing the leadership of the Palestinian people and asserting sovereignty and the rule of the Muslim religion over all of Palestine, including all territory of the State of Israel);

9. In *Sisso v. Islamic Republic of Iran*, the court found that on September 19, 2002, Hamas detonated a bomb on Bus No. 4 in Tel Aviv, Israel. *Sisso*, 2007 WL 20075 at *1 (D.D.C. July 5, 2007). The court found Iran liable for the attack because it had "intentionally provided material support [to Hamas] in furtherance of that terrorist activity in the years leading up to and including 2002." *Id.* at 11 (finding that Iran and MOIS knowingly and substantially provided material support and resources to Hamas in furtherance of Hamas's terrorist activities, such as the September 19, 2002 Tel Aviv bus bombing); *Id.* (finding that "Iran and MOIS have aided and abetted HAMAS' goal of Islamic jihad through perpetration of terrorist attacks in the West Bank, Gaza, and within Israel, and HAMAS

has been encouraged by Iran to continue and increase such attacks, often acting in return for direct financial compensation from Iran for specific terrorist acts," and therefore that plaintiff may recover against Iran and MOIS for intentional infliction of emotional distress);

10. In *Bodoff v. Islamic Republic of Iran*, the court found that on February 25, 1996, Hamas detonated a bomb on Egged bus No. 18. *Bodoff*, 424 F. Supp. 2d 74, 77 (D.D.C. 2006). The court found Iran liable for the attack because it had provided material support to Hamas in the years "immediately preceding the attack." *Id.* at 79, 85 (finding that defendants Iran conspired with, and providing material support to, Hamas in furtherance of the terrorist suicide bus bombing that caused the death of Yonathan Barnea);

11. In *Greenbaum v. Islamic Republic of Iran*, the court found that on August 9, 2001, Hamas detonated a bomb at a Sbarro restaurant in Jerusalem, Israel. *Greenbaum*, 451 F. Supp. 2d at 94. The court found Iran liable for the attack because it had provided material support to Hamas as early as 2000 including "the period immediately preceding the attack." *Id.* at 97 (finding that Iran actively provided material support to Hamas between 2000-2001 "at a fever pitch");

12. In *Campuzano v. Islamic Republic of Iran*, the court found that on September 4, 1997, Hamas carried out a triple suicide bombing at the crowded Ben Yehuda Street pedestrian mall in Jerusalem, Israel. *Campuzano*, 281 F. Supp. 2d at 260. The court found Iran liable for the attack because it had provided material support to Hamas as early as 1995. *Id.* at 262 (finding a bombing committed by Hamas would not have occurred without material support from Iran);

13. In *Stern v. Islamic Republic of Iran*, the court found that on July 30, 1997, Hamas carried

out a double suicide bombing at the Mahane Yehuda outdoor produce market in downtown

Jerusalem, Israel. *Stern*, 271 F. Supp. 2d 286, 289 (D.D.C. 2003). The court found Iran

liable for the attack because it had provided material support to Hamas as early as 1994.

*Id.* at 291, 298–299 (finding that Iran provided Hamas with massive amounts of material

support and resources, including military training of hundreds of operatives, for the express

purpose of carrying out terrorist attacks such as the bombing on July 30, 1997);

14. In *Weinstein v. Islamic Republic of Iran*, the court found that on February 25, 1996, Hamas

detonated a bomb on Egged bus No. 18 in Jerusalem, Israel. *Weinstein*, 184 F. Supp. 2d

13, 15 (D.D.C. 2002). The court found Iran liable for the attack because it had provided

material support to Hamas as early as 1995. *Id.* at 19, 21–22 (explaining, in detailed

findings of fact, that Iran provided large-scale material and technical support to Hamas

which enabled Hamas to commit certain bus bombings and which earned Iran a place on

the U.S. Department of State's list of nations that support terrorism);

15. In *Mousa v. Islamic Republic of Iran*, the court found that on February 25, 1996, Hamas

detonated a bomb on Egged bus No. 18 in Jerusalem, Israel. *Mousa*, 238 F. Supp. 2d 1, 3

(D.D.C. 2001). The court found Iran liable for the attack because it had provided material

support to Hamas "prior to and at the time" of the bombing. *Id.* (finding that Iran supports

terrorist and other activities of Hamas, in monetary amounts ranging between $50 and $100

million per year, and did so prior to and at the time of the February 25, 1996 bombing at

issue in this action); and

16. In *Eisenfeld v. Islamic Republic of Iran*, the court found that on February 25, 1996, Hamas

detonated a bomb on Egged bus No. 18 in Jerusalem, Israel. *Eisenfeld*, 172 F. Supp. 2d 1,

4 (D.D.C. 2000). The court found Iran liable for the attack because it had provided material support to Hamas. *Id.* at 5 (finding that Hamas acknowledges support from Iran in the amount of $15 million per month, funds which support both terrorism and a broad range of welfare activities as part of its program).

17. In *Bluth v. Islamic Republic of Iran* the court found Iran as a "state sponsor of terrorism" who provided "material support or resources" to Hamas. *Bluth,* 203 F.Supp.3d 1 (D.D.C. 2016). Having found that Hamas was responsible for the March 7, 2002 attack in Atzmona, Israel the court held that Iran is liable under § 1605A(c) for any personal injuries caused by Hamas's attack.

18. In *Braun v. Islamic Republic of Iran* the court found Iran and Syria to be "state sponsors of terrorism" who each provided material support and resources to Hamas, and having found that Hamas was responsible for the October 22, 2014 attack that murdered Chaya Zissel Braun. *Braun*, 228 F. Supp. 3d at 71.

Notably, different courts in this Circuit have found Iran responsible for multiple Hamas attacks in 1994, 1996, 1997, 2001, 2002, 2003, 2014, 2016, and 2017 based upon an extensive record of Iranian support for Hamas preceding those attacks. Judicial notice of judicial records, especially in the FSIA context, allows courts to avoid "'relitigat[ing] issues that have already been settled' in previous decisions." *Murphy*, 740 F. Supp. 2d at 58 (*quoting Brewer*, 664 F. Supp. 2d at 55); *see Harrison v. Republic of Sudan*, 882 F. Supp. 2d 23, 31 (D.D.C. 2012) ("When a court has found facts relevant to a FSIA case . . . , courts in subsequent, related cases may 'rely upon the evidence presented in earlier litigation . . . without necessitating the formality of having that evidence reproduced.'") (*quoting Taylor*, 811 F. Supp. 2d at 6–7). Therefore, in light of the numerous decisions in this Circuit wherein Iran has been found liable for providing material

support to Hamas over a period of time spanning and including 2014, the date of the terrorist attack that killed Max Steinberg, and upon the independent expert testimony of Dr. Levitt, this Court should find Iran jointly and severally liable for the injuries suffered by the Plaintiffs and enter judgment against Iran, jointly and severally, in favor of each of the Plaintiffs.

## IV.    THE SYRIAN ARAB REPUBLIC IS LIABLE AS A STATE SPONSOR OF HAMAS

In addition to finding Iran liable as a state sponsor of the terrorism and sponsor of Hamas, this Court should also find that Syria is jointly and severally liable for their timely and critical material support to Hamas. Like Iran, Syria may be held liable under 28 U.S.C. § 1605A if it (1) provided "material support or resources" for hostage taking, torture, and an extrajudicial killing; (2) if the provision of material support was engaged in by an official while acting within the scope of his office; (3) the defendant was a "state-sponsor of terrorism" at the time the act complained of occurred; and (4) the claimant or the victim was a "US national" at the time of the act of terrorism.[15] 28 U.S.C. § 1605A(a)(1), (a)(2).

The evidence that the Syria provided material support and resources, as defined by 18 U.S.C. § 2339A(b), to Hamas is on a scale such that the imposition of liability under 28 U.S.C. § 1605A(c) is required.

For the purposes of satisfying the requirements of 28 U.S.C. § 1605A(a)(1), it is noted that Syria provided safe haven and more significant material support for the sponsorship of and committing of terror to Hamas beginning in 2000. Levitt Report at 31. As Dr. Levitt explains, "as far back as 2000, the State Department acknowledged Syria's political and material support for Hamas. In its 2000 Patterns on Global Terrorism report, the Department recognized that 'the Syrian Government allowed HAMAS to open a new main office in Damascus.'" *Id.* In 2003,

27

Congress passed the *Syria Accountability and Lebanese Sovereignty Restoration Act of 2003* to punish Syria for this support for terrorism, in addition to the country's occupation of Lebanon and development of weapons of mass destruction. *Id.*

Syria's support for Hamas continued throughout the early and mid-2000s. *Id.* at 32. In its 2006 Country Reports on Terrorism, the State Department found that "the group retains a cadre of leaders and facilitators that conduct diplomatic, fundraising, and arms smuggling activities in Lebanon, Syria, and other states."[16] *Id.* Other annual State Department reports detail high-level meetings among and between Hamas leaders, representatives of other terror groups, and the Syrian Government, including a September 2005 meeting with Syrian President Bashar al-Asaad.[17] *Id.* Similarly, in 2008, the government permitted two Palestinian conferences attended by Hamas to take place in Syria.[18] *Id.*

When a foreign sovereign allows a terrorist organization to operate from its territory, such as facilitating diplomatic, fundraising, and arms smuggling activities, this meets the statutory definition of "safehouse" under 18 U.S.C. § 2339A(b):

> Insofar as the government of the Republic of Sudan affirmatively allowed and/or encouraged al Qaeda and Hezbollah to operate their terrorist enterprises within its borders, and thus provided a base of operations for the planning and execution of terrorist attacks -- as the complaint unambiguously alleges -- Sudan provided a "safehouse" within the meaning of 18 U.S.C. § 2339A, as incorporated in 28 U.S.C. § 1605(a)(7).

*Owens v. Republic of Sudan*, 412 F. Supp. 2d 99, 108 (D.D.C. 2006)).

---

[16] U.S. Department of State Office of the Coordinator for Counterterrorism, Country Reports on Terrorism (2006), April 30, 2007, accessed July 25, 2019, https://2009-2017.state.gov/j/ct/rls/crt/2006/82738.htm.

[17] U.S. Department of State Office of the Coordinator for Counterterrorism, Country Reports on Terrorism (2005), April 28, 2006, accessed July 25, 2019, https://2009-2017.state.gov/j/ct/rls/crt/2005/64337.htm.

[18] U.S. Department of State Office of the Coordinator for Counterterrorism, Country Reports on Terrorism (2008), April 30, 2009, accessed July 25, 2019, https://2009-2017.state.gov/j/ct/rls/crt/2008/122436.htm.

In addition to the provision of a safehouse for Hamas, there is compelling evidence that Syria, by and through the Assad regime and individual members of the Assad regime acting within the scope of their offices, provided significant material support for terror and cooperated with Hamas leadership and its terrorist network, for the purposes of launching terrorist attacks in Israel that inevitably killed and injured Americans.  As Dr. Levitt explains, "[t]he Syrian government has also expressed rhetorical support for Hamas and its cause over the years. President Assad has said, 'we [Syria] seek to support the Intifada […] just as we stood by the Lebanese struggle we will struggle'". *Levitt Report,* p.32.

The third element required to establish jurisdiction asks whether the defendant foreign sovereign was a "state-sponsor of terrorism" at the time the act complained of occurred.  28 U.S.C. § 1605A(a)(2)(A)(i)(I).  The term "state-sponsor of terrorism" is defined by the statute at 28 U.S.C. § 1605A(h)(6):

> the term 'state sponsor of terrorism' means a country the government of which the Secretary of State has determined, for purposes of section 6(j) of the Export Administration Act of 1979 (50 U.S.C. § 4605(j)), section 620A of the Foreign Assistance Act of 1961 (22 U.S.C. § 2371), section 40 of the Arms Export Control Act (22 U.S.C. § 2780), or any other provision of law, is a government that has repeatedly provided support for acts of international terrorism . . . .

 Syria has been designated as a state-sponsor of terrorism continuously since December 29, 1979 and Syria's continued designation as a state-sponsor of terrorism was noted on May 18, 2004, 69 Fed. Reg. 28,098, 28,100 (2004), and in 2005, as well as at other times.  31 C.F.R. § 596.201 (2005). Moreover, Syria remains on the State Department list of State Sponsors of Terrorism today. *Levitt Report*, at 31

During the Second Intifada and beyond the Government of Syria "continued its longstanding policy of sponsoring terrorism by providing safe-haven to Hamas".  *Id.* at 32–38.

From 2001-2011, Hamas was headquartered in Damascus, Syria. *Id*. This material support for terror was provided in tandem with the critical support that Iran also was supplying to Hamas at that time. *Id.* Moreover, "decades of Syria sponsorship of Hamas, through at least 2012, has undoubtedly enhanced Hamas terrorist and military capabilities." *Id.* at 38. And, although there may have been a falling out with Damascus in 2012, "Hamas continues to enjoy the benefits of Syria's past support through the use of Syrian training models and methods of terrorism." *Fraenkel v. Islamic Republic of Iran*, 248 F. Supp. 3d 21, 31 (D.D.C. 2017)( ("Syria's support throughout the 2000[s] has been instrumental for the organization to grow, to gain political support, to fund raise, to carry out, to plan its operation, to coordinate with other groups and at times also to gain funding and weapon[s] and training.").

### A. Syria Provided Safehaven and Material Support to Hamas Leadership.

Over time, Syrian support for Hamas significantly enhanced the group's terrorist capabilities. Levitt Report, p. 32. According to the US Department of State's annual report Patterns of Global Terrorism, during the FY year 2000:

> Syria continued to provide safehaven and support to several terrorist groups, some of which maintained training camps or other facilities on Syrian territory…The Syrian Government allowed HAMAS to open a new main office in Damascus in March [2001]…In addition, Syria granted a variety of terrorist groups—including HAMAS, the
>
> PFLP-GC, and the PIJ—basing privileges or refuge in areas of Lebanon's Bekaa Valley under Syrian control.

*Id.*, *citing* Patterns of Global Terrorism, 2000. http://www.state.gov/j/ct/rls/crt/2000/. The 2001 Report echoed the findings from the previous year, noting that "HAMAS continued to maintain offices in Damascus… [and] provided Hizballah, HAMAS, PFLP-GC, the PIJ, and other terrorist organizations refuge and basing privileges in Lebanon's Beka'a Valley, under Syrian control." *Id.,* *citing* Patterns of Global Terrorism, 2001,

http://www.state.gov/documents/organization/10296.pdf.    The    following    year,    the    State

Department assessment was much the same:

> The Syrian Government has continued to provide political and limited material support to
> a number of Palestinian groups, including allowing them to maintain headquarters or
> offices in Damascus. …The most notable Palestinian rejectionist groups in Syria are the
> Popular Front for the Liberation of Palestine (PFLP), the Popular Front for the Liberation
> of Palestine-General Command (PFLP-GC), the Palestine Islamic Jihad (PIJ), and the
> Islamic Resistance Movement (HAMAS).

*Id.,        citing*        Patterns        of        Global        Terrorism,        2002,

http://www.state.gov/documents/organization/20117.pdf.    In 2003, the State Department removed

the qualifier "limited" in its assessment, suggesting that Syrian support for Hamas and other

Damascus-based groups had actually increased. The report read as follows:

> The Syrian Government in 2003 continued to provide political and material support
> to Palestinian rejectionist groups. HAMAS, the PIJ, the Popular Front for the
> Liberation of Palestine–General Command, and the Popular Front for the
> Liberation of Palestine operate from Syria…Many of these groups claimed
> responsibility for anti-Israeli terrorist acts in 2003.

*Id.*,        *citing*        Patterns        of        Global        Terrorism,        2003,

http://www.state.gov/documents/organization/31944.pdf.    In 2004, according to the State

Department report, Hamas "continue[d] to operate from Syria…" Patterns of Global Terrorism,

2004, http://www.state.gov/documents/organization/45322.pdf.    Hamas long maintained offices

and personnel in Damascus, and in 1999 the group moved its headquarters there after Jordanian

officials shut the group's office and deported several leaders from Amman.  From Damascus,

Hamas leaders like Khalid Mishal, Mousa Abu Marzouk, and Imad al-Alami—all U.S.-designated

terrorists—oversaw Hamas operations, training of new recruits, financing, and more.  *Levitt*

*Report,* p. 33.    For example, the Treasury Department noted in 2002 that then-Hamas Secretary

General Khalid Mishal not only headed the group's executive committee from Damascus, he also

used his safe haven in Syria to finance Hamas military operations, plan attacks, and supervise

terrorist attacks[19].  *Id.*  By allowing Hamas to maintain its headquarters in Damascus, Syria provided safehaven and other material support to the leadership of Hamas to operate freely within the Middle East territories and to be enabled to commit acts of terror against civilians, including the Plaintiffs in the within action.

### B.  Syria provided Operational and Financial Support to Hamas.

Beyond Syria's provision of sanctuary and access of training facilities to Hamas, Hamas leaders in Syria also oversaw the financing of Hamas operations in the West Bank and Gaza Strip. Levitt Report, p. 35. In one case, Israeli authorities discovered that Hamas political leaders in Syria and Lebanon transferred funds to Jamal Tawil, a Hamas military commander from Ramallah arrested in April 2002, on a monthly basis.[20] *Id.* Funding for Hamas operations continued to flow from the group's headquarters in Syria for many years. *Id.* at 38.   In July 2011, for example, Israeli officials arrested Ayman al-Adam, a Hamas operative through whom Hamas leaders in Syria delivered money and instructions on how to assemble bombs and carry out kidnappings to members of a Hamas cell in Hebron.[21]  *Id.*

In his report, Dr. Levitt sets forth evidence he gathered about the training and instruction that Hamas operatives underwent in Syria. *Id.* at 31–38.   Although there was some evidence that there was a falling out in 2012 between Hamas and Syria because of the ongoing civil war in Syria and Hamas' reluctance to take sides, Hamas has enjoyed and continues to enjoy the benefits of Syria's past support through the ongoing use of Syrian training models and methods of terrorism.

---

[19] U.S. Designates Five Charities Funding Hamas and Six Senior Hamas Leaders as Terrorist Entities," U.S. Department of the Treasury, August 22, 2003 https://www.treasury.gov/press-center/press-releases/Pages/js672.aspx
[20] Margot Dudkevitch, "IDF may pull out of Jenin, Nablus by Sunday," *The Jerusalem Post*, April 18, 2002; and "I.D.F. Activities in the West Bank Last Night and the Arrest of the Head of Hamas in Ramallah and the Commander of the city's military brigade," available online at http://www.idf.il/english/announcements/2002/april/16.stm
[21] Matthew Levitt, "Hamas Shifts to an Outside-In Operational Strategy," PolicyWatch 1848, The Washington Institute for Near East Policy, September 26, 2011, https://www.washingtoninstitute.org/policy-analysis/view/hamas-shifts-to-an-outside-in-operational-strategy

Syria's support throughout the 2000[s] and subsequently has been instrumental for the organization to grow, to gain political support, to fund raise, to carry out, to plan its operation, to coordinate with other groups and at times also to gain funding and weapon[s] and training.. Dr. Levitt's report makes clear that without Syria's support from the early 1990s to 2012, Hamas would not be as strong or organized as it is was in 2014 and as it is today.  *Id.  See also Fraenkel*, 248 F. Supp. 3d at 31.

Hamas and its leaders received substantial material support from Syria, including but not limited to: operational and logistical support for its militants in the West Bank and Gaza, safehaven for its leadership in Damascus and the training of its militants in Lebanon, safe passage and transit across Syrian territory, and provision of financial assistance in support of Hamas as a matter of policy, before during, and after the Second Intifada. As Dr. Levitt concludes that like Iran, without the wide range of long-standing material support provided by Syria to Hamas, Hamas could "never have become the capable and deadly terrorist organization it is today" and when it carried out the deadly attack that killed Max Steinberg.  *Levitt Report* at 39.

This extreme level of support clearly satisfies the causation requirement under 28 U.S.C. § 1605A.  Causation under the FSIA has been defined by the D.C. Circuit to mean "proximate cause".  *Flanagan v. Islamic Rep. of Iran*, 2016 U.S. Dist. LEXIS 72331, *87 (D.D.C. June 3, 2016) *citing* to *Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123, 1127–28 (D.C. Cir. 2004). "Proximate causation normally requires only that there be 'some reasonable connection between the act or omission of the defendant and the damage which the plaintiff has suffered.'" *Id. citing* to Prosser & Keeton on the Law of Torts 263 (5th ed. 1984); *Kilburn*, 376 F.3d at 1128). Proximate causation is "'often explicated in terms of foreseeability or the scope of the risk created by the predicate conduct . . . .'" *Id.*, *quoting Paroline v. United States*, 572 U.S.

434, 134 S. Ct. 1710, 1719, 188 L. Ed. 2d 714 (2014)). Proximate cause precludes liability where the connection "'between conduct and result is so attenuated that the consequence is more aptly described as mere fortuity.'" *Id.*, *quoting Paroline*, 134 S. Ct. at 1719.

**C. Under Fed. R. Evid. 201, this Court Should Take Judicial Notice of the Decisions Finding that Syria Materially Supported Hamas In Its Execution of Acts of Terrorism.**

As discussed above, under Fed. R. Evid. 201, this Court can take judicial notice of conclusions of liability entered in previous cases. This Court has previously found that Syria was liable for providing various kinds of material support to Hamas for the express purpose of enabling Hamas to launch various terrorist attacks resulting in the injury and/or murder of American citizens. This Court is able to take judicial notice of the following decisions, which enable it to conclude that Syria materially supported Hamas:

1.  Most recently, in *Roth v. Syrian Arab Republic*, the court found that on August 9, 2001 Hamas detonated a ten-pound bomb at a Sbarro restaurant.  *Roth*, 2018 WL 4680270, at *4 This Court found Syria liable for the attack because it provided material support to Hamas at the time of the attack. *Id.* at 18;

2.  In *Fraenkel v. Islamic Republic of Iran et. al.,* the court found that in June 2014, Hamas was liable for the hostage taking and murder of three young men, including American Yaakov Naftali Fraenkel, and that Syria had provided material support to Hamas at the time of the attack. *Fraenkel*, 248 F. Supp. 3d at 31.

3.  In *Braun v. Islamic Republic of Iran et. al*., the Court found that Syria had materially sponsored Hamas such that it provided financial support, arms, "training for the planning and execution of terrorist attacks," and "safe haven and refuge" to Hamas and

its operatives and was responsible for the October 22, 2014 attack that murdered Chaya

Zissel Braun. *Braun*, 228 F. Supp. 3d at 71.

Accordingly, this Court should find Syria jointly and severally liable for the injuries

suffered by the Plaintiffs and enter judgment in their favor.

## V.    DEFAULT JUDGMENT MAY BE PROPERLY ENTERED BY THIS COURT AGAINST IRAN AND SYRIA AS PLAINTIFFS HAVE MET THEIR BURDEN OF PROOF.

28 U.S.C. § 1608(e) provides that "no judgment by default shall be entered by a court of

the United States or of a State against a foreign state, a political subdivision thereof, or an agency

or instrumentality of a foreign state, unless the claimant establishes his claim or right to relief by

evidence satisfactory to the court." *Han Kim v. Democratic People's Republic of Korea*, 774 F.3d

1044, 1047 (D.C. Cir. 2014) ("when the defendant State fails to appear and the plaintiff seeks a

default judgment, the FSIA leaves it to the court to determine precisely how much and what kinds

of evidence the plaintiff must provide, requiring *only* that it be 'satisfactory to the court.'"), *citing*

28 U.S.C. § 1608(e) (emphasis added).

To satisfy this burden, plaintiffs must present evidence concerning their backgrounds and

injuries suffered, and also may request the Court take judicial notice of prior findings of fact and

evidence from a related proceeding. *See e.g.*, *Taylor*, 811 F. Supp. 2d at 6–7. This allows courts to

"rely upon the evidence presented in earlier litigation . . .  without necessitating the formality of

having that evidence reproduced." *Murphy*, 740 F. Supp. 2d at 55.  28 U.S.C. § 1608(e) does not

require any more evidence or a higher standard of evidence than the Court would ordinarily receive

to render a judgment. *See Han Kim*, 774 F.3d at 1046 (finding that because the defendants "'[had]

not participated in the proceedings' . . . the plaintiffs 'cannot be expected to meet a typical standard

for judgment as a matter of law.'"); *see also Commercial Bank of Kuwait*, 15 F.3d at 242

(explaining that 28 U.S.C. § 1608(e) does not require "evidentiary hearings or explicit findings where the record shows that the plaintiff provided sufficient evidence in support of its claims.").

Here, default judgment as to liability for Iran is proper given the Plaintiffs have demonstrated that (1) Hamas committed the attack which killed Max Steinberg and injured his immediate family members and (2) Iran is jointly and severally liable to the Plaintiffs under 28 U.S.C. § 1605A(c) for its role in sponsoring and providing massive amounts of material support to Hamas at the relevant times. Accordingly, as Iran has been served with summons, complaint and notice of suit, as required under 28 U.S.C. § 1608(a), and Iran has failed to answer, and default has been entered by the Clerk of Court, judgment may now be entered by this Court finding the Iran jointly and severally liable for the Plaintiffs' injuries and damages.

Default judgment as to liability for Syria is also proper given the Plaintiffs have demonstrated that (1) Hamas committed the attack which killed Max Steinberg and which injured his immediate family members and (2) Syria is jointly and severally liable to the Plaintiffs under 28 U.S.C. § 1605A(c) for their role in sponsoring and providing massive amounts of material support to Hamas at the relevant times.  Accordingly, as Syria has been served with summons, complaint and notice of suit, as required under 28 U.S.C. § 1608(a), and Syria having failed to answer, and default has been entered by the Clerk of Court, judgment may now be entered by this Court finding Syria jointly and severally liable for the Plaintiffs' injuries and damages.

VI.    **UPON FINDING IRAN AND SYRIA JOINTLY AND SEVERALLY LIABLE FOR PLAINTIFFS' INJURIES, THIS COURT SHOULD AWARD COMPENSATORY AND PUNITIVE DAMAGES TO EACH OF THE PLAINTIFFS.**

The Plaintiffs are each entitled to damages because (1) they are the representatives of the Estate of the decedent Max Steinberg or (2) they are immediate family members of Max Steinberg, being either the parents or the siblings of the decedent.  In addition, each of them is entitled to an

award of punitive damages against Iran and Syria, under 28 U.S.C. § 1605A(c), for their sponsorship of Hamas and this heinous act of murder. In order for a plaintiff to receive damages, the plaintiff must show that her injuries were "reasonably certain" to occur, that is, more likely to occur than not, as a result of the state sponsor of terror's conduct. *Salazar v. Islamic Republic of Iran*, 370 F. Supp. 2d 105, 115 (D.D.C. 2005) (*quoting Hill v. Republic of Iraq*, 328 F.3d 680, 681 (D.C. Cir. 2003)) (internal quotations omitted).

**A**. **Economic Damages.**

**1. The Estate of Max Steinberg Has Standing To Bring a Claim For Economic Damages.**

The Estate of Max Steinberg, through its legal representative, is entitled to recover economic damages. Economic damages are available to compensate the estate of the deceased for the victim's lost earning capacity. *Valore*, 700 F. Supp. 2d at 83(explaining that estates of those who did not survive can recover economic losses stemming from wrongful death of the decedent).

28 U.S.C. § 1605A(c), the Foreign Sovereign Immunities Act (FSIA) exception for bringing cases against foreign states for "personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking or the provision of material support or resources for such an act…" 28 U.S.C. § 1605(a)(1). 28 U.S.C. § 1605A(c) provides a private right of action for a foreign state to be held liable to,

> (1) a national of the United States,
> (2) a member of the armed forces,
> (3) an employee of the Government of the United States, or of an individual performing a contract awarded by the United States Government, acting within the scope of the employee's employment, or
> **(4) the legal representative of a person described in paragraph (1), (2) or (3)** for the personal injury or death caused by acts described in subsection (a)(1) of that foreign state or of an official, employee, or agent of that foreign state, for which the courts of the United States may maintain jurisdiction under this section for money damages. In such an action, damages may include economic damages, solatiuim, **pain and suffering,** and punitive damages.

37

28 U.S.C. § 1605A(c).  (Emphasis Added).

The Estate of Max Steinberg is represented before the Court by its duly appointed legal representative.  *See* Letters of Administration for the Estate of Max Steinberg attached hereto as Exhibit C and incorporated herein by reference. In the case of a deceased individual, claims which might have been brought by the individual while they were alive may be brought by their proper legal representative, such as an estate administrator.  "On the death of a person in whose favor or against whom a right of action has accrued for any cause prior to his death, the right of action, for all such cases, survives in favor of or against the legal representative of the deceased." D.C. Code Ann. § 12-101 (West).  Similarly, California, where the Estate of Max Steinberg has been opened, provides for survivorship causes of action and directs that the claims pass to and survive to the personal representatives of the decedent. Specifically, the statute provides that the executors or administrators may maintain an action on the decedent's behalf against the party against whom the cause of action accrued, and state that the action may be commenced by the decedent's personal representative or if none, by the decedent's successor in interest. *See* Surviving cause of action; Cal. Civ. Proc. Code § 377.30 (West).  Therefore, it is clear that no matter which state law is applied, Max Steinberg's estate has proper standing to bring its claims pursuant to 28 U.S.C. § 1605A(c) for economic damages and that the causes of action relating to Max's death survive and may be brought in this Court through his properly appointed legal representative.

## 2.    The Estate of Max Steinberg has Suffered Economic Loss.

Evidence of Max Steinberg's economic loss has been established and provided by submitting the expert report of Dr. Chad Staller, an expert in the field of forensic economics.  *See* Expert Report of Dr. Chad Staller for the Estate of Max Steinberg attached hereto as Exhibit D

and incorporated herein by reference. Dr. Staller's experience and expertise in the field of forensic economics is detailed in his curriculum vitae *See* Curriculum Vitae of Dr. Chad Staller attached to Staller Expert Report as Exhibit A, Appendix A, p. 2-8. Dr. Staller has testified in approximately 230 state and federal cases nationwide. *See* Testimony List for Chad L. Staller attached as Exhibit A, Appendix A, p. 9-14. His testimony has been accepted by U.S. district and appellate courts as well as in state circuit, appellate and supreme courts.

In his report for the Estate of Max Steinberg, Dr. Staller reviews the methodology of calculation of economic loss. Ex. D. Dr. Staller concludes that assuming Max Steinberg lived his life and was employed to the age of 61.8[22], then total economic loss for lost wages and benefits, net of personal consumption and taxes would be $934,010 as reflected in Table 1 and the Summary Table attached to Dr. Staller's Report. Had Max Steinberg been employed to the age of 67[23], then total economic loss for lost wages and benefits, net of personal consumption and taxes would be $1,085,740 as reflected in Table 2 and the Summary Table attached to Dr. Staller's Report. Accordingly, the total economic loss ranges from $934,010 to $1,085,740. Ex. D., p. 4.

### B. Solatium/Intentional Infliction of Emotional Distress Damages.

Damages for solatium are to compensate for "the mental anguish, bereavement[,] and grief that those with a close personal relationship to a decedent experience as the result of the decedent's death, as well as the harm caused by the loss of the decedent['s] society and comfort." *Valore*, 700 F. Supp. 2d at 85(*citin*g *Belkin v. Islamic Republic of Iran*, 667 F. Supp. 2d 8, 22 (D.D.C. 2009)). The Court has in previous decisions on behalf of victims of state sponsored terrorism established a standard for solatium damages under the FSIA. The general rule of the Court is that parents of

---

[22] Statistical worklife expectancy
[23] Social Security retirement age

deceased victims should each receive a baseline award of $5 million in damages, and siblings should each receive a baseline award of $2.5 million in damages. *Estate of Heiser*, 466 F. Supp. 2d at 269.

These amounts may fluctuate from the baselines if there are aggravating circumstances, such as a "general feeling of permanent loss or change caused by decedent's absence,"*Murphy*, 740 F. Supp. 2d at 79 (*quoting Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1, 31 (D.D.C. 1998)), or other "circumstances that appreciably worsen a claimant's pain and suffering." *Murphy*, 740 F. Supp. 2d at 79(*quoting Greenbaum*, 451 F. Supp. 2d at 108). Aggravating circumstances allow the Court considerable discretion to increase a plaintiff's damages by substantial amounts. *See Valore*, 700 F. Supp. 2d at 86 (solatium damages increased by 25% due to aggravating circumstances); *Greenbaum*, 451 F. Supp. 2d at 108 (solatium damages increased by $1 million due to aggravating circumstances). In *Wultz v. Islamic Republic of Iran*, the court increased the plaintiff's baseline award from $5 million to $7 million because the plaintiff directly witnessed his son's body impacted by shrapnel, and also later suffered Post-Traumatic Stress Disorder ("PTSD"). *Wultz*, 864 F. Supp. 2d at 40. There are similar aggravating circumstances in this case which justify an upward departure from the conventional baseline in the solatium damages calculation for each of the surviving parents and each of the siblings of Max Steinberg.

Courts in the District of Columbia have held that a plaintiff is entitled to recover for her own emotional distress when (1) extreme and outrageous conduct on the part of the Defendants (2) intentionally or recklessly (3) causes the plaintiff severe emotional distress. *Howard Univ. v. Best*, 484 A.2d 958, 985 (D.C. 1984)(citations and internal quotations omitted). Actual physical injury is not necessary to establish intentional infliction of emotional distress. *Bodoff*, 424 F. Supp. 2d at 85–86; *See also Howard University*, 484 A.2d at 985(*citing Waldon v. Covington*, 415

A.2d 1070, 1076 (D.C. 1980)(noting that "an action for intentional infliction may be made out even in the absence of physical injury or impact")).

### 1. Evie Steinberg

Max Steinberg's mother, Evie Steinberg, experienced and continues to experience severe and unconscionable mental anguish, bereavement, and unbearable grief as a result her son's murder and tragic death, and her corresponding loss of society and comfort. In her Declaration, which the Plaintiffs attach hereto as Exhibit E and incorporate herein by reference, are details of Evie Steinberg's anguish and continued grief.

In her Declaration, Mrs. Steinberg avers that she is citizen of the United States, Evie Steinberg Decl., Ex. E, ¶2. She is the mother of Max Steinberg who was also a United States citizen, having been born on September 20, ███ in California. *Id.* Max was murdered on July 20, 2014. *Id. at* ¶3.

Evie describes the nightmare which began for her on July 20, 2014. *Id. at* ¶5. She explains that following Max's murder, she thinks of Max 24 hours a day, 7 days a week. *Id. at* ¶6. She no longer sleeps well, has anxiety and has panic attacks. *Id.* She explains that while she used to love celebrating and observing holidays, she now has anxiety and dread during holiday seasons and often doesn't observe them with her family. *Id. at* ¶8. She also has difficulty carrying out daily activities and responsibilities that used to be part of her role in the family, such as shopping and cooking. *Id. at* ¶10. Max's murder has also caused Evie significant financial hardships. *Id. at* ¶14-16.

While the courts typically award a baseline solatium damages award of $5 million for the death of a child, Plaintiffs suggest to and request of the Court that Evie Steinberg is entitled to a

significant upward adjustment as the Court deems proper for the unbearable loss which Evie has

suffered as a result of Max's murder.

### 2. Stuart Steinberg

Stuart Steinberg, , Max Steinberg's father, experienced severe and unconscionable mental

anguish, bereavement, and unbearable grief as a result of his son's heinous murder and tragic death

and corresponding loss of society and comfort. The details of Stuart's anguish and grief which he

experienced is described in the attached Declaration.  See Declaration of Stuart Steinberg attached

hereto as Exhibit F and incorporated herein by reference.

In his Declaration, Mr. Steinberg avers that he is citizen of the United States, having been

born in California on August 12, ███.  Stuart Steinberg Decl., Ex.F, ¶2.

Stuart Steinberg was devastated by his son's murder.  *Id. at* ¶5.  He explains, on July 20,

2014 his life and the lives of family were turned upside down.  *Id. at* ¶6.   Overnight, the family

was forced to come to terms with the reality that we would never see, hug, kiss, touch, laugh, cry,

celebrate, or share a special moment together with Max ever again.  *Id.*  Stuart explains that since

Max's death he has had an empty, sick feeling in his stomach that has not diminished in nearly 5

years and that he still awakes every morning trying to catch his breath.  *Id.*  Stuart's Declaration

explains the incredibly close bond the father and son shared.  *Id.* at ¶7,9-11.  They shared a love

of sports and often spent time together sharing this common interest.  *Id.* at ¶10.

Max's death also had a profound impact on Stuart's career.  *Id.* at ¶13.  Prior to Max's

death Stuart had been promoted to COO from his previous position as Sales Manager of a full

service real estate company. *Id.*  He was employed by this company from April 2010 until July of

2015. *Id.*  The promotion included an increase in earnings, health insurance, contribution into a

401k plan, a company car, and other miscellaneous benefits. *Id.*  Following Max's death, Stuart

lost the focus, passion, enthusiasm and drive for his job. *Id.* at ¶14.  He left his position as COO, and instead took a sales management position, which no longer had the favorable base salary and other benefits including health insurance, 401k contribution, paid vacation, car and phone allowances.  *Id.*  His current position is based on commission only and no longer has the financial security of guaranteed compensation and benefits.  *Id.* at ¶14-15.  As a result, his wife has had to take on a second job to subsidize household and family expenses.  *Id.* at ¶15.  Following Max's death, Stuart sought out psychologists, rabbis, and friends to try to find the inner strength to cope with the fact that his son was killed. *Id.* at ¶13.  Consequently, Stuart Steinberg should receive a baseline solatium damages award of $5 million and such significant upward adjustment as the Court deems proper for the unbearable loss which Stuart suffered as a result of his son Max's murder.

While the courts typically award a baseline solatium damages award of $5 million for the death of a child, Plaintiffs suggest to and request of the Court that Stuart Steinberg is entitled to a significant upward adjustment as the Court deems proper for the unbearable personal and economic loss which Stuart has suffered as a result of Max's murder.

### 3.  Paige Steinberg

Max Steinberg's sister, Paige Steinberg, experienced and continues to experience severe and unconscionable mental anguish, bereavement, and unbearable grief as a result of her brother's heinous murder and tragic death and corresponding loss of society and comfort. The details of Paige's anguish and grief are described in her Declaration.  See Declaration of Paige Steinberg, attached hereto as Exhibit G and incorporated herein by reference.

In her Declaration, Paige avers that she was born on August 16, ██. *Id.* ¶2.  Paige was born in California and is a United States citizen.  *Id.*  She is the biological sister of Max Steinberg.

*Id.* at ¶3.   The murder of her brother has been extremely emotionally and psychologically devastating for her.  *Id.* at ¶4.  Following Max's murder, Paige left her family in California and moved to Israel. *Id.* at ¶6.  She dealt with Max's death by trying to be like him. *Id.*   Paige left for Israel to escape the reality of how Max's death broke her family in the United States and to try to feel closer to him in Israel. *Id.*  She attended school in Israel, but had difficulty focusing in classes and would wake up at night crying.  *Id.* at ¶7.  She has experienced anxiety and is often physically sick.  *Id.* at ¶7-8.  She has also chosen employment which while not as financially rewarding, is necessary, because it allows her to have time off if she emotionally needs to take a break or attend memorial events for her brother.  *Id.* at ¶9.  Not having Max at her wedding or to be an uncle to her children has also been especially painful.  *Id.* at ¶10.   Her intense grief continues to this day. *Id.*

Consequently, Paige Steinberg should receive a baseline solatium damages award of $2.5 million and such significant upward adjustment as the Court deems proper for the unbearable loss which Paige has suffered as a result of her brother Max's murder.

### 4. Jake Steinberg

Jake Steinberg, Max Steinberg's brother, experienced and continues to experience severe and unconscionable mental anguish, bereavement, and unbearable grief as a result of his brother's heinous murder and tragic death and corresponding loss of society and comfort. The details of Jake's anguish and grief are described in his Declaration.  See Declaration of Jake Steinberg, attached hereto as Exhibit H and incorporated herein by reference.

In his Declaration, Jake Steinberg avers that he was born September 21, ███.  *Id.* at ¶2. Jake was born in California and is a United States citizen.  *Id.*   He is the biological brother of Max Steinberg.   *Id.* at ¶3.   The murder of his brother has been extremely emotionally and

psychologically devastating for him. *Id.* at ¶4. Jake explains that the quality of his life has been significantly impacted since Max was killed in 2014. *Id.* at ¶5. While Jake has tried to cope with his brother's death, the combination of grief and stress detrimentally affected Jake's health. *Id.* at ¶6. He lost a significant amount of hair, and his weight fluctuated. *Id.* He had difficulty sleeping and his relationships with friends and his significant other were often strained because of his grief. *Id.* He also found it harder to work and worked less, which caused significant financial ramifications. *Id.*

Following Max's murder, Jake moved back home. *Id.* At the time of Max's passing, as a recent graduate of UCLA, Jake was employed as a paralegal. *Id.* at ¶7. Jake was studying for the LSAT and had planned to attend law school. *Id.* Once Max was murdered, Jake was unable to focus and study, and his interest in law plummeted. *Id.* Although it was anticipated that Jake would have a promising legal career, those plans were derailed, and Jake never pursued them again. *Id.* Instead of a legal career, Jake's work has been focused on a non-profit Israel advocacy group. *Id.* at ¶8. While he gets satisfaction from his employment, he recognizes that he is less likely to have the financial stability that would have come from a career in law. *Id.* at ¶9. To this day, Jake continues to mourn the loss of his brother and closest friend. *Id.* at ¶10.

Consequently, Jake Steinberg should receive a baseline solatium damages award of $2.5 million and such significant upward adjustment as the Court deems proper for the unbearable loss which Jake has suffered as a result of his brother Max's murder.

## C. Punitive Damages.

Punitive damages serve to "punish and deter the actions for which they are awarded." *Murphy*, 740 F. Supp. 2d at 80. Four factors determine the amount of punitive damages: "(1) the character of the defendants' act, (2) the nature and extent of harm to the plaintiffs that the

defendants caused or intended to cause, (3) the need for deterrence, and (4) the wealth of the defendants." *Id.* Punitive damage awards under the FSIA serve multiple purposes:

> [b]y creating these rights of action, Congress intended that the Courts impose a substantial financial cost on states which sponsor terrorist groups whose activities kill American citizens. This cost functions both as a direct deterrent, and also as a disabling mechanism: if several large punitive damage awards issue against a foreign state sponsor of terrorism, the state's financial capacity to provide funding will be curtailed.

*Flatow*, 999 F. Supp. at 33.

28 U.S.C. § 1605A(c) specifically allows the award of punitive damages for personal injury or death resulting from an act of state-sponsored terrorism. In recognition of the difficulty of bringing terrorists to justice personally, Congress created jurisdiction over, and rights of action against, their foreign state sponsors. Punitive damage awards under the FSIA serve multiple purposes:

> [b]y creating these rights of action, Congress intended that the Courts impose a substantial financial cost on states which sponsor terrorist groups whose activities kill American citizens. This cost functions both as a direct deterrent, and also as a disabling mechanism: if several large punitive damage awards issue against a foreign state sponsor of terrorism, the state's financial capacity to provide funding will be curtailed.

*Flatow*, 999 F. Supp. at 33. Therefore, in addition to the traditional focus of punitive damages upon individual punishment and general deterrence, this law emphasizes specific deterrence of the transgressing state sponsors of terrorism so that future sponsorship may be prevented.

In this case, the evidence shows Defendants materially supported, protected, harbored, aided, abetted, enabled, sponsored, provided safehaven to and conspired with and subsidized a known terrorist organization whose modus operandi included the targeting, brutalization and murder of American citizens and others. The character of these acts requires an award of punitive

damages. *E.g., Cronin v. Islamic Republic of Iran*, 238 F. Supp. 2d 222, 235 (D.D.C. 2002)(finding the character of the defendant's act—where the defendant provided material support and resources to terrorist organizations to carry out acts such as kidnapping and torture—supported a punitive damage award of $300,000,000.00).

Premeditated violence against civilian targets is not a legitimate action by any government. It does not matter whether such violence is undertaken directly or indirectly. Civilized society cannot tolerate states whose partnership with terrorist groups like Hamas, is formed for the purpose of achieving foreign policy goals through the murder and torture of innocent persons. Thus, in deciding that an award of punitive damages is necessary, this Court is especially cognizant of the purpose of the state-sponsor of terrorism exception to the FSIA.

Specifically, in cases that have calculated the punitive damages for state sponsors of terrorism, such as *Acosta v. The Islamic Republic of Iran*, 574 F. Supp. 2d 15, 31 (D.D.C. 2008), this Court held that a three times multiplier should be applied to the state sponsor of terrorism's annual budget for terrorism in order to determine an appropriate punitive damage award to adequately deter state sponsors of terrorism. Moreover, in *Estate of Heiser v. Islamic Republic of Iran*, 659 F. Supp. 2d 20, 30–31 (D.D.C. 2009), this Court saw no reason to depart from the *Acosta* methodology in calculating punitive damages as this methodology was considered to have the requisite deterrent effect. *See Id.*

In *Valore*, this Court upheld the methodology in *Heiser* and *Acosta* but used a five times multiplier of annual state sponsored terrorism expenditures, rather than the three times multiplier used in *Heiser* and *Acosta*. The court held specifically that two numbers are at issue: the multiplicand-the amount of [the state sponsor of terrorism's] annual expenditures on terrorist activities-and the multiplier-the factor by which the multiplicand should be multiplied to yield the

desired deterrent effect. *Id.* In *Valore*, this Court awarded one billion dollars in punitive damages against Iran.

Syria, as a state sponsor of terrorism, spends between U.S. $500,000,000 (at a minimum) and U.S. $700,000,000 annually on terrorism-related expenditures. *Baker*, 775 F. Supp. 2d at 85. Accordingly, using a three to five times multiplier of these amounts would result in a punitive damages range of $1.5 billion to $3.5 billion. It should also be noted that even in cases where a state sponsor of terrorism's expenditures are not known, punitive damages of up to $300 million dollars have been awarded. *See Calderon-Cardona v. Democratic People's Republic of Korea*, 723 F. Supp. 2d 441 (D.P.R. 2010). In *Baker*, the court made a determination that the appropriate amount for punitive damages was $150 million per victim and their families.

In *Gates*, the measure applied by the court in awarding $300 million dollars was $150 million dollars per family for each of the two families.  Judge Collyer found that with regard to Syria's sponsorship of terrorism in the year of 2004, "[p]remeditated violence against civilian targets is not a legitimate action by any government. Civilized society cannot tolerate states whose partnership with terrorist surrogates…is formed for the purpose of achieving political victory through heinous acts of barbarism". *Gates*, 580 F. Supp. 2d at 74. Courts have used a multiplier of three to five times the amount of compensatory damages awarded to determine an appropriate punitive damages amount. *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 126 S. Ct. 1235, 163 L. Ed. 2d 1097 (2006).

Terrorist acts sponsored by State Sponsors of Terror and committed by designated Foreign Terror Organizations is an unconscionable abuse of the proper role of a government.  Syria was first placed on the US Department of State List of State Sponsors of Terror in 1979 when the list was first created and Iran was placed on the list in 1984.  Syria and Iran have each remained, and

remain to this day as a designated State Sponsors of Terror.  Congress, in enacting provisions enabling the award of punitive damages against state sponsors of terror did so, *inter alia*, in order to hold those governments legally accountable, to punish them and to hopefully deter them from doing so.  Considering each of the stated purposes of punitive damages, noting that both Syria and Iran have provided and continue to provide material support to Hamas, a Foreign Terror Organization, and in order for this Court to send the loudest message possible that continued support for terror will not be countenanced, not only for deterrence purposes, but also to punish these rogue nations for their outrageous and sustained support of terror, this Court should impose the highest possible punitive damages award that the Court deems to be fair, just and proper under the circumstances.   Such an award will not only punish and deter but also serve as a disabling mechanism to help stop the continued ability of the Islamic Republic of Iran and the Syrian Arab Republic to provide funding to terrorist organizations.

Therefore, the Court should find that the range of appropriate punitive damages can be found in such awards as *Heiser*, *Acosta* and *Valore*, which used the multiplier of terrorism related expenditures ranging from three to five times the annual expenditure on terrorism, and accordingly this Court should assess a punitive damages award against the Defendants, and each of them, in the range of $1.5 to $3.5 billion, or at a minimum make an award to the Steinberg family of $150 million dollars in punitive damages.

## CONCLUSION

WHEREFORE, for the reasons set forth above, the Plaintiffs request that the Court enter default judgment against the Defendants, the Islamic Republic of Iran and the Syrian Arab Republic, jointly and severally, on behalf of each of them, finding that Iran's and Syria's material support for Hamas proximately caused the act of terrorism that resulted in Max Steinberg's murder

and his near family members' injuries. Plaintiffs further request that upon finding Iran and Syria jointly and severally liable, this Court award to the Estate of Max Steinberg damages for his economic losses; and award Evie Steinberg, Stuart Steinberg, Paige Steinberg and Jake Steinberg damages for their solatium loss under 28 U.S.C. § 1605A(c); and make an award to each of the Plaintiffs, in such amount as the Court deems appropriate and just, as an assessment of punitive damages against both the Islamic Republic of Iran and the Syrian Arab Republic for their continued support of heinous acts of murder committed as acts of international terror.

Dated: August 9, 2019                              Respectfully submitted,

                                                   HEIDEMAN NUDELMAN
                                                   & KALIK, P.C.
                                                   1146 19th Street, N.W., 5th Floor
                                                   Washington, DC 20036
                                                   Telephone:  202-463-1818
                                                   Telefax:  202-463-2999

                                                   By:  /s/Richard D. Heideman
                                                        /s/ Tracy Reichman Kalik
                                                    Richard D. Heideman (No. 377462)
                                                    Noel J. Nudelman (No. 449969)
                                                    Tracy Reichman Kalik (No. 462055)