# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| THE ESTATE OF MAX STEINBERG, *et al.* ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Civil Action No. 17-cv-1910 (RCL) |
| ) | |
| THE ISLAMIC REPUBLIC OF IRAN and ) | |
| THE SYRIAN ARAB REPUBLIC, ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM OPINION

Max Steinberg, an American citizen fighting for the Israeli army, was ambushed and killed in Gaza City on July 20, 2014. Compl. ¶¶ 41–42, ECF No. 1. Plaintiffs—Max's estate, parents, and siblings—have brought claims and seek damages pursuant to the Foreign Sovereign Immunities Act ("FSIA") against the Islamic Republic of Iran and the Syrian Arab Republic. *Id.* ¶ 1. Pending before the Court is plaintiffs' motion for default judgment. ECF No. 18. For the reasons set forth below, the Court concludes that the plaintiffs' motion will be **GRANTED**.

## I.    PROCEDURAL HISTORY

Plaintiffs filed their original complaint on September 18, 2017. Compl., ECF No. 1. Their causes of action are premised on § 1605A of the FSIA, as is this Court's jurisdiction. Iran was served with process on May 16, 2018. ECF No. 12. Syria was served with process on June 20, 2018. ECF No. 15. Neither defendant made a response and neither has appeared in this case. The Clerk of the Court entered default against Iran on July 25, 2018, and against Syria on October 15, 2018. ECF Nos. 14, 17. Plaintiffs have now moved for entry of default judgment against defendants, both as to liability and damages. Mot. Default J., ECF No. 18.

1

## II. FINDINGS OF FACT

Section 1608(e) of the FSIA prohibits courts from entering a default judgment "unless the claimant establishes his claim or right to relief by evidence satisfactory to the court." 28 U.S.C. § 1608(e). The Court cannot "simply accept a complaint's unsupported allegations as true," and must "inquire further before entering judgment against parties in default." *Rimkus v. Islamic Republic of Iran*, 750 F. Supp. 2d 163, 171 (D.D.C. 2010) (internal quotations omitted). In considering evidence and making findings of fact, the Court may rely on affidavits and may take judicial notice of prior related proceedings. *Id.*

### A. The Attack

On July 20, 2014, Max's Israeli army unit initiated a mission to discover and destroy underground tunnels used by Hamas, a Palestinian terrorist organization. Dr. Ronni Shaked Expert Decl. ¶¶ 55–56, ECF No. 18-2.[1] During the mission, Hamas terrorists launched rocket-propelled grenades at an Israeli armored vehicle, killing Max and six of his fellow soldiers. *Id.* ¶ 56. Following the attack, Hamas kidnapped the body of Shaul Oron, a soldier from Max's brigade who had also been killed. *Id.* ¶ 57.

Shortly thereafter, Hamas took credit for the attack. *Id.* ¶ 58. It disseminated its claim of responsibility through its website, where it claimed that "fighters of the Izzadin Al-Qassam Battalions were able to ambush an armored carrier and kill 14 soldiers." *Id.* In a video clip broadcast on television, a Hamas spokesman confirmed personal details of its dead captive, Oron. *Id.* ¶ 59. The backdrop of the video displayed a Hamas flag. *Id.* According to plaintiffs'

---

[1] Dr. Ronni Shaked is the Head of the Department in Middle Eastern Studies at Hebrew University in Jerusalem. He has a Masters degree in Middle Eastern Studies and a Ph.D. in Middle Eastern and Social Psychology from Hebrew University. He has previously provided expert testimony to this Court regarding international terrorism and terrorist organizations such as Hamas. *See, e.g., Baxter v. Islamic Republic of Iran*, No. 11-cv-02133 (D.D.C. Sept. 27, 2019). The Court once again shall treat Dr. Shaked as an expert on these matters.

expert Dr. Shaked, "[o]fficial sources in Israel, the Prime Minister's Office, the Foreign Ministry and [the Israeli army] Spokesman confirmed that Hamas carried out the terrorist attack." *Id.* ¶ 65.

## B. Defendants' Support of Hamas

Hamas is described by the State Department as "an outgrowth of the Palestinian branch of the Muslim Brotherhood" that "has conducted anti-Israeli attacks, including suicide bombings against civilian targets inside Israel." U.S. DEP'T OF STATE, COUNTRY REPORTS ON TERRORISM 2014 at 292 (2015) [hereinafter *Country Reports on Terrorism*]. It has been "the most successful of all [Palestinian] terrorist organizations over the past 30 years," and "strives to establish a Palestinian state founded on Islamic law . . . in place of the state of Israel." Dr. Shaked Expert Decl. ¶ 34, ECF No. 18-2. "Hamas sanctifies Jihad as the sole method of action to destroy the State of Israel." *Id.*

Iran has been designated as a State Sponsor of Terrorism since 1984 "and continued its terrorist-related activity in 2014." *Country Reports on Terrorism* at 284. "Iran has historically provided weapons, training, and funding to Hamas and other Palestinian terrorist groups . . . ." *Id.* at 285. Historical Iranian support of Hamas is well-documented by the State Department and acknowledged by this Court. *See Roth v. Islamic Republic of Iran*, 78 F. Supp. 3d 379, 388–89 (D.D.C. 2015). In 2012, however, relations between Hamas and Iran stalled. Dr. Matthew Levitt Expert Decl. 26, ECF No. 18-3.[2] Hamas's refusal to support Syrian leader Bashar al-Assad's regime against rebellion distressed Assad's Iranian allies. *Id.* at 26–27. Iran began to withhold substantial funds from Hamas. *Id.* at 27. But relations appeared to be on the mend the following

---

[2] Dr. Matthew Levitt is a Senior Fellow and Director of the Reinhard Program on Counterterrorism and Intelligence at the Washington Institute. He has a Masters of Law and Diplomacy (MALD) and a Ph.D. in International Relations from The Fletcher School of Law and Diplomacy at Tufts University. He has previously provided expert testimony to this Court regarding international terrorism and terrorist financing. *See, e.g., Wyatt v. Syrian Arab Republic*, 908 F. Supp. 2d 216 (D.D.C. 2012). The Court once again shall treat Dr. Levitt as an expert on these matters.

year. Speaking in late 2014, Iran's Supreme Leader "highlighted Iran's military support to 'Palestinian brothers' in Gaza and called for the West Bank to be similarly armed. In December, 2014, Hamas Deputy Leader Moussa Abu Marzouk announced bilateral relations with Iran and Hamas were 'back on track.'" *Country Reports on Terrorism* at 285. Plaintiffs' expert Dr. Levitt claims that even in the midst of the political controversy, Iran continued to fund Hamas's military wing. Dr. Levitt Expert Decl. 27, ECF No. 18-3. Dr. Levitt also cites Iranian officials in 2014 explicitly stating that "Iran is supporting Hamas," and that "[m]uch of the arms Hamas deployed were the products of the Islamic Republic of Iran." *Id.* (quotations omitted). Six months before Max's killing, an aide to a Hamas leader confirmed that "relations between [Hamas and Iran] are now almost back to how they were before [the crisis over Syria]. We believe we will soon be back at that point." *Id.* The State Department's report on terrorism for 2014 summarized: "Since the conclusion of [an Israeli military offensive], Iranian governmental officials have publicly stated a willingness to resume Iran's military support of Hamas, including arming Hamas in the West Bank with the same weapons as in Gaza, but it remains unclear whether efforts have resumed." *Country Reports on Terrorism* at 173.

Syria, meanwhile, has been designated as a State Sponsor of Terrorism since 1979. *Country Reports on Terrorism* at 287. This Court has noted that "Hamas undertook to carry out acts of extrajudicial killing and terrorism against Jews in Israel, the West Bank and Gaza, and in return Syria undertook to provide Hamas with material support and resources to carry out such extrajudicial killings and terrorist attacks." *Roth v. Syrian Arab Republic*, 2018 WL 4680270, at *3 (D.D.C. Sept. 28, 2018) (quoting *Braun v. Islamic Republic of Iran*, 228 F. Supp. 3d 64, 71 (D.D.C. 2017)). For years, Syria provided safe haven to Hamas. *Id.* The terrorist group operated its headquarters out of Damascus until 2012. *Id.* "In fact, Syrian military intelligence worked

4

closely with Hamas military leaders in Syria, and [i]nstructions for terrorist attacks were transmitted directly from Damascus to the terrorist cell that was to carry out the attack." *Id.* (internal quotations omitted). Through Syria, Hamas channeled financial support, smuggled weapons, and conducted training. *Id.* Hamas and Syria cut ties in 2012 following the aforementioned Syrian civil war rift, but Hamas continued to benefit from the substantial support that it had received from Syria up to that point. Dr. Levitt Expert Decl. 26, 38, ECF No. 18-3.

## C. Plaintiffs' Status and Injuries

The Court now makes findings regarding each plaintiff, including the injuries each plaintiff suffered as a result of Max Steinberg's killing and each plaintiff's citizenship (as is relevant to their entitlement to recover under § 1605A of the FSIA).

### 1. Max Steinberg

Max Steinberg was killed in the July 20, 2014, attack. Dr. Shaked Expert Decl. ¶ 56, ECF No. 18-2. He was 24 years old. *Id.* ¶ 28. He is represented in this litigation by his father, Stuart Steinberg, who serves as special administrator of Max's estate. Compl. ¶ 9, ECF No. 1. Max was a United States citizen. Stuart Steinberg Decl. ¶ 19, ECF No. 18-7.

### 2. Stuart Steinberg

Stuart Steinberg is Max Steinberg's father. Stuart Steinberg Decl. ¶ 3, ECF No. 18-7. He constantly reckons with the reality that he will never see, hug, or speak with his son ever again. *Id.* ¶ 6. To him, the loss is incomparable. *Id.* Max's birth had coincided with the loss of Stuart's own mother, and his love filled a void that is once again empty. *Id.* ¶ 7. After experiencing the paternal satisfaction of watching his son grow from boy to man, Stuart then endured having to see his son cut down in the prime of his youth. *Id.* ¶ 11. His emotional trauma caused him to step

down from a promotion and has hindered him financially. *Id.* ¶ 13–14. He sees no end to his grief. *Id.* ¶ 16.

### 3. Evie Steinberg

Evie Steinberg is Max Steinberg's mother. Evie Steinberg Decl. ¶ 3, ECF No. 18-6. Her declaration describes a devastated woman, riddled with anxiety and victim to sleeplessness and panic attacks. *Id.* ¶ 6. The loss of her son has sapped her enjoyment of life and caused her to mask her brokenness for the sake of her family. *Id.* ¶ 7, 11. Holidays that were once eagerly anticipated are now dreaded reminders of life without Max. *Id.* ¶ 8. The emotional weight of the loss has fostered neglect of her health, finances, and relationships. *Id.* ¶ 10, 15, 16.

### 4. Jake Steinberg

Jake Steinberg is Max Steinberg's brother. Jake Steinberg Decl. ¶ 3, ECF No. 18-9. Jake describes health issues stemming from his emotional trauma: hair loss, weight fluctuations, and sleeplessness among them. *Id.* ¶ 6. He worked less and earned less. *Id.* His law school ambitions faded away. *Id.* ¶ 7. To Jake, the future looks much less bright without Max in it. *Id.* ¶ 10.

### 5. Paige Steinberg

Paige Steinberg is Max Steinberg's sister. Paige Steinberg Decl. ¶ 3, ECF No. 18-8. Since Max's death she has felt robbed of peace and unable to relax. *Id.* ¶ 7. To cope with the loss she moved from her home in the United States to Israel, where Max was killed. *Id.* ¶ 5. She sought out lower paying jobs that offered more flexibility so she would have personal time to attempt to heal. *Id.* ¶ 9. She attributes her seemingly constant illness to the stress brought on by Max's death. *Id.* ¶ 8.

## III. Conclusions of Law

### A. Sovereign Immunity

The FSIA is the "sole basis for obtaining jurisdiction over a foreign state in our courts." *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434 (1989). Foreign sovereign immunity is "a matter of grace and comity on the part of the United States, and not a restriction imposed by the Constitution." *Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480, 486 (1983). Only specifically enumerated exceptions to that principle may authorize a district court to assert subject matter jurisdiction over claims against a foreign state. *Odhiambo v. Republic of Kenya*, 764 F.3d 31, 34 (D.C. Cir. 2014). The D.C. Circuit has stated that "if no exception applies, the district court has no jurisdiction." *Id.*

District courts must decide whether an exception to foreign sovereign immunity applies "even if the foreign state does not enter an appearance to assert an immunity defense." *Verlinden*, 461 U.S. at 493 n.20. "When a requirement goes to subject-matter jurisdiction, courts are obligated to consider *sua sponte* issues that the parties have disclaimed or have not presented." *Gonzales v. Thaler*, 565 U.S. 134, 141 (2012).

### B. Jurisdiction

#### 1. Subject Matter Jurisdiction

Under 28 U.S.C. § 1330, federal district courts have original subject matter jurisdiction over (1) nonjury civil actions (2) for claims seeking relief *in personam* (3) against a foreign state (4) when the foreign state is not entitled to immunity either under §§ 1605–1607 of Title 28. 28 U.S.C. § 1330(a). Each requirement is met in this case. First, plaintiffs have not demanded a jury trial—this is a nonjury civil action. Second, this is a suit against defendants as legal persons and not a suit against property. The claims, therefore, seek relief *in personam*. *Cf. Gang Luan v.*

*United States*, 722 F.3d 388, 399 n.15 (D.C. Cir. 2013) ("*In personam* jurisdiction is jurisdiction over the defendant. *In rem* jurisdiction is jurisdiction over the property."). Third, both defendants in this suit, Iran and Syria, are plainly foreign states.

The final requirement for jurisdiction under § 1330(a)—that there be an available exception to sovereign immunity—requires its own breakdown. Under 28 U.S.C. § 1605A, state sponsors of terrorism do not enjoy immunity under the FSIA. That section establishes that a foreign state has no immunity

> in any case . . . in which [1] money damages are sought [2] against a foreign state [3] for personal injury or death [4] that was caused by [5] an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act if such act or provision of material support or resources is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency.

28 U.S.C. § 1605A(a)(1).

Each element of this section is met. First, plaintiffs seek only monetary remedies for their injuries. Second, both defendants are foreign states under the FSIA. Third, plaintiffs have proven instances of personal injury or death and all claims arise from these instances. Under § 1605A, such injury or death "must merely be the bases of a claim for which money damages are sought." *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 66 (D.D.C. 2010). Jurisdiction is not restricted to physical injury suffered directly by each claimant. *Id.* Thus, plaintiffs' various claims for emotional injuries stemming from Max's death constitute the type of claims required for jurisdiction.

Fourth, defendants caused the injury or death under the FSIA. Section 1605A(a)(1)'s causation element may be satisfied by showing "some reasonable connection between the act or omission of the defendant and the damages which plaintiff has suffered." *Valore*, 700 F. Supp. 2d at 66 (D.D.C. 2010). Plaintiffs need not show their injuries would have occurred "but for"

8

defendants' actions. *Roth*, 78 F. Supp. 3d at 394. Here, plaintiffs have sufficiently demonstrated a "reasonable connection" between their damages and defendants' acts. The facts found by the Court demonstrate that Iran has supported Hamas by bankrolling and encouraging Hamas's terror operations, and that Syria has supported Hamas by serving as a "major conduit[] for funneling weapons and explosives to Hamas and safe haven[] for training hundreds of its operatives." Dr. Levitt Decl. 33, ECF No. 18-3. This is sufficient for the relatively low proximate cause bar imposed by the FSIA.

Finally, plaintiffs base their claims around an extrajudicial killing materially supported "by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency." 28 U.S.C. § 1605A(a)(1). In this context, provision of material support or resources has the same meaning as it is given in 18 U.S.C. § 2339A. 28 U.S.C. § 1605A(h)(3). That section defines "material support or resources" as

> any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel (1 or more individuals who may be or include oneself), and transportation, except medicine or religious materials.

18 U.S.C. § 2339A(b)(1). Plaintiffs have established that Max was killed by Hamas, which has long received material support and resources, including funding, training, and safe haven, from Iran and Syria.

Extrajudicial killing, meanwhile, has the same meaning as it is given in § 3 of the Torture Victim Protection Act of 1991. 28 U.S.C. § 1605A(h)(7). That section defines extrajudicial killing as

> a deliberated killing not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples. Such term, however, does not include any such

killing that, under international law, is lawfully carried out under the authority of a foreign nation.

*See* Torture Victim Protection Act of 1991, Pub. L. No. 102-256, § 3(a), 106 Stat. 73.

Unlike paradigm FSIA cases in which innocent civilians are unsuspectingly murdered by terrorists, these circumstances involve a volunteer soldier engaged in a combat mission under the flag of a foreign military. Perhaps surprisingly, none of those facts disqualifies Max's killing from being "extrajudicial." The killing was deliberate and not authorized by any previous judgment, nor was it carried out under the authority of a foreign nation. Hamas, after all, has been labeled as a "specially designated global terrorist" by executive order. *Holy Land Found. for Relief & Dev. v. Ashcroft*, 333 F.3d 156, 159–60 (D.C. Cir. 2003). Congress, clarifying another terrorism victim recovery statute, specifically excluded such terrorists from qualifying as "military forces." 18 U.S.C. § 2331(6)(ii). This Court need not decide whether the animating spirit behind the state sponsor of terrorism exception envisioned plaintiffs like Max—the law as written recognizes his death as the result of an extrajudicial killing at the hands of known terrorists. Neither defendant has ventured a competing argument.

Both defendants are liable under 28 U.S.C. § 1605A(a)(1). Thus, the final jurisdictional requirement under 28 U.S.C. § 1330 has been met.

## 2. Personal Jurisdiction

Federal courts have personal jurisdiction over a foreign state if (1) the court has jurisdiction pursuant to § 1330(a), and (2) service has been properly made under § 1608 of the FSIA. 28 U.S.C. § 1330(b). As established above, the requirements for jurisdiction under § 1330(a) are met in this case. The Court next proceeds to an analysis of § 1608's requirements for service.

The valid methods of service under the FSIA are listed in order of preference. *Worley v. Islamic Republic of Iran*, 75 F. Supp.3d 311, 327 (D.D.C.2014). When a method of service is unavailable or unsuccessful, a plaintiff may attempt the next method available. *Id.* The first preference is for "any special arrangement[s]" for service between the plaintiff and the foreign state (i.e. a contract provision). 28 U.S.C. § 1608(a)(1). If no special arrangement exists, the second option is service "in accordance with an applicable international convention on service of judicial documents." *Id.* § 1608(a)(2). In this case, both of these options were unavailable because the parties do not have a special arrangement, nor is there an applicable international convention for service with Iran or Syria. *See Braun*, 228 F. Supp. 3d at 78.

Plaintiffs therefore attempted service on Iran and Syria pursuant to 28 U.S.C. § 1608(a)(3). ECF Nos. 6, 7. Section 1608(a)(3) requires that "one copy of the summons, complaint, and notice of suit, together with a translation of each document into the language of the foreign state" be sent through any form of mail that requires a signed receipt by "the clerk of the court to the head of the ministry of foreign affairs of the foreign state concerned." 28 U.S.C. § 1608(a)(3). A copy of the Certificate of Mailing filed on November 6, 2013, shows that the appropriate copies were sent by the clerk of this court to the Ministries of Foreign Affairs of Iran and of Syria. ECF No. 8. Neither Iran nor Syria executed on the summons.

Plaintiffs then proceeded to the final available method, service through diplomatic channels, as described in § 1608(a)(4). ECF No. 9. The State Department confirmed transmission of the documents to the Iranian Ministry of Foreign Affairs by way of the Foreign Interests Section of the Embassy of Switzerland in Tehran, Iran. ECF No. 12. The State Department confirmed transmission of the documents to the Syrian Ministry of Foreign Affairs by way of the Foreign Interests Section of the Embassy of the Czech Republic in Damascus, Syria. ECF No.

15. In light of these filings, the Court concludes that plaintiffs have complied with § 1608(a)(4) and have, therefore, properly served defendants in accordance with the FSIA. The Court may exercise personal jurisdiction over defendants.

### 3. Threshold Requirements to Hear a Claim

Even with otherwise valid jurisdiction, the Court may hear a claim under § 1605A only if three conditions are met: (1) the foreign state was designated as a state sponsor of terrorism at the time of the act (or was so designated in response to the act); (2) the claimant or victim was a national of the United States at the time of the act; and (3) in cases where the act occurred in the foreign state against whom suit has been brought, the foreign state was afforded a reasonable opportunity to arbitrate the claim in accordance with the accepted international rules of arbitration. 28 U.S.C. § 1605A(a)(2). Each of these conditions is met here.

First, as discussed above, both defendants have long been designated state sponsors of terrorism. Both defendants remain designated as state sponsors of terrorism today. *See* STATE SPONSORS OF TERRORISM, U.S. DEP'T OF STATE, https://www.state.gov/state-sponsors-of-terrorism/. Second, all claimants or victims are nationals of the United States, as established through affidavit testimony and submission of passport photocopies. Finally, Max's killing occurred in Gaza City, not in Iran or Syria, so plaintiffs were not required by statute to afford defendants a reasonable opportunity to arbitrate. Dr. Shaked Expert Decl. ¶ 54–56, ECF No. 18-2.

### C. Timeliness

Section 1605A(b) provides that an action may be brought "10 years after the date on which the cause of action arose." 28 U.S.C. § 1605A(b)(2). The attack giving rise to this action occurred on July 20, 2014. Plaintiffs' cause of action arose on that date. *Cf. Amobi v. D.C. Dep't*

*of Corr.*, 755 F.3d 980, 994 (D.C. Cir. 2014) (internal citation omitted) (holding that under District of Columbia law, the statute of limitations usually begins running when a plaintiff "sustains a tortious injury"). Plaintiffs filed their original complaint on September 18, 2017, fewer than 10 years from the date their cause of action arose. Therefore, plaintiffs' claims are timely under § 1605A of the FSIA.

## D. FSIA Liability

Section 1605A(c) provides a federal private right of action for victims of state sponsored terrorism. The designated state may be liable to a "national of the United States" or his "legal representative" for "personal injury or death caused by . . . that foreign state . . . for which the courts of the United States may maintain jurisdiction . . . for money damages." 28 U.S.C. § 1605A(c). Successful plaintiffs may recover "economic damages, solatium, pain and suffering, and punitive damages." *Id.*

Defendants, for the reasons stated above in Parts I.B and III.B.3, are state sponsors of terrorism within the meaning of subsection (a)(2)(A)(i) and may be held liable. Plaintiffs, as established in Part III.B.3, are each citizens of the United States and fall within subsection (c)(1)'s ambit.

For the reasons stated in Part III.B.1, the Court finds that the acts giving rise to this case are of the type for which a foreign state may be held liable under § 1605A(c). Specifically, the evidence establishes that an extrajudicial killing was committed by members of Hamas and that defendants provided material support in furtherance of these acts.

13

### E. Plaintiffs' Claims

Plaintiffs seek to recover economic damages arising from Max's wrongful death, solatium damages for intentional infliction of emotional distress ("IIED"), and punitive damages on behalf of all plaintiffs. The Court will consider each theory of recovery below.

#### 1. Wrongful Death

Count I of plaintiffs' complaint is vague and mostly duplicative. Compl. ¶¶ 98–101, ECF No. 1. It does, however, sweep in a wrongful death claim on behalf of all plaintiffs. *Id.* ¶ 101. This Court has previously determined that a decedent's heirs at law, through the decedent's estate, may bring a wrongful death action under § 1605A(c) "for economic losses which result from a decedent's premature death." *Valore*, 700 F. Supp. 2d at 78 (internal citation omitted). Where defendants are liable for a decedent's extrajudicial killing, as these defendants are, they may be held "liable for the economic damages caused to decedents' estates." *Id.* Plaintiffs have sufficiently proved the validity of their wrongful death theory of recovery against defendants.

#### 2. Loss of Solatium/IIED

Under the FSIA, a solatium claim is indistinguishable from an IIED claim. *Valore*, 700 F. Supp. 2d at 85. Plaintiffs' separate counts for loss of solatium damages and IIED damages will thus be considered together. Relying principally on the Restatement (Second) of Torts, this Court has set out the following standard for recovery on a theory of IIED in § 1605A(c) cases: "One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm." *Estate of Heiser v. Islamic Republic of Iran*, 659 F. Supp. 2d 20, 26 (D.D.C. 2009) (quoting Restatement (Second) of Torts § 46(1)).

An actor may also be liable for IIED to a party against whom the extreme and outrageous conduct was not directed if that party is (1) a member of the victim's immediate family and (2) was present at the time of the extreme and outrageous conduct. *See Murphy v. Islamic Republic of Iran*, 740 F. Supp. 2d 51, 75 (D.D.C. 2010) (citing Restatement (Second) of Torts § 46(2)(a)). The "immediate family" requirement is strictly construed in FSIA cases—generally, only spouses, parents, siblings, and children are entitled to recover. *Id.* As to the issue of presence, this Court has previously held that one "need not be present at the time of a terrorist attack upon a third person to recover for severe emotional injuries suffered as a result." *Valore*, 700 F. Supp. 2d at 80. This is because terrorism is sufficiently extreme and outrageous to demonstrate that it is intended to inflict severe emotional harm on even those not present at the site of the act. *Id.*

The plaintiffs have stated a valid theory of recovery as to their IIED claims. As this Court has previously held, "[a]cts of terrorism are by their very definition extreme and outrageous and intended to cause the highest degree of emotional distress." *Murphy*, 740 F. Supp. 2d at 74 (quoting *Belkin v. Islamic Republic of Iran*, 667 F. Supp. 2d 8, 22 (D.D.C. 2009)). Uncontroverted affidavits submitted by plaintiffs demonstrate that such emotional distress did result. Also, the evidence establishes that Iran and Syria intentionally provided material support to Hamas, and did so with the intent that Hamas would carry out attacks that would cause severe emotional distress. Finally, plaintiffs have proved the additional elements of an IIED claim applicable when the claim is based on actions directed against a third person. Each has established by uncontroverted affidavits that they are Max Steinberg's immediate family members. Further, although the family member plaintiffs do not allege that they were present at the site of the attack, this requirement is not imposed when the extreme and outrageous conduct is a terrorist attack such as this.

## F. Damages

Having established defendants' liability for plaintiffs' injuries, the Court proceeds to decide the amount of individual damages to which each plaintiff is entitled.

### 1. Legal Standard

Damages available under § 1605A "include economic damages, solatium, pain and suffering, and punitive damages." 28 U.S.C § 1605A(c). Accordingly, deceased plaintiffs' estates can recover economic losses stemming from wrongful death of the decedent; family members can recover solatium for their emotional injury; and all plaintiffs can recover punitive damages. *Valore*, 700 F. Supp. 2d at 83.

"To obtain damages against a non-immune foreign state under the FSIA, a plaintiff must prove that the consequences of the foreign state's conduct were 'reasonably certain' (i.e., more likely than not) to occur, and must prove the amount of damages by a 'reasonable estimate' consistent with this [Circuit]'s application of the American rule on damages." *Salazar v. Islamic Republic of Iran*, 370 F. Supp. 2d 105, 115–16 (D.D.C. 2005) (quoting *Hill v. Republic of Iraq*, 328 F.3d 680, 681 (D.C. Cir. 2003)) (internal quotation marks omitted). As to the issue of a reasonable estimate of damages in cases brought under § 1605A, a court may consider prior damage awards for pain and suffering and solatium as examples for determining an appropriate award for each plaintiff. *Acosta v. Islamic Republic of Iran*, 574 F. Supp. 2d 15, 29 (D.D.C. 2008).

All damages in this case spring from Max Steinberg's death and the pain and suffering his family experienced as a result. Such consequences were "reasonably certain" to occur as a result of defendants' material support of Hamas' terrorist activities. Indeed, expert testimony indicates that this fact was clear even to Iran and Syria. *Cf. Braun*, 228 F. Supp. 3d at 82–83

(citing expert declarations explaining that Iran and Syria provided material support to Hamas, a known terrorist organization, "which has as its goal the targeting of civilians for acts of terror," and concluding that Iran and Syria's "conduct in supporting Hamas was likely, and intended, to result in injury and death to civilians and to devastate the families of the victims"). Therefore, the Court will next evaluate the validity of plaintiffs' theories of liability.

### 2. Economic Loss

Economic loss damages can be recovered pursuant to § 1605A(c). Such damages may be proven by the submission of a forensic economist's expert report. *Belkin*, 667 F. Supp.2d at 24. In considering an award for lost future earnings, the Court shall take account of the reasonableness and foundation of the assumptions relied upon by the expert. *Reed v. Islamic Republic of Iran*, 845 F. Supp.2d 204, 214 (D.D.C.2012).

To compute the economic damages associated with Max's death, plaintiffs submitted a forensic economic expert's report. Mr. Chad Staller Report, ECF No. 18-5. [3] The report bases its calculations on reasonable and well-founded assumptions about Max's likely earnings had he survived. *Id.* Using Max's statistical worklife expectancy, plaintiffs' expert Mr. Staller estimated that Max would have worked for another 34.7 years to the age of 61.8. *Id.* Based on that estimation, Mr. Staller calculated the net economic loss to Max's estate at $934,010. Accordingly, the Court awards the Estate of Max Steinberg wrongful death damages in the amount of $934,010.

---

[3] Chad Staller is president of the Center for Forensic Economic Studies. He has a J.D. and M.B.A. from Temple University, as well as a Master of Accountancy from Villanova University. He holds a C.V.A. through the National Association of Certified Valuation Analysts. The Court shall treat Mr. Staller as an expert on forensic economics.

### 3. Solatium/IIED

Solatium is a form of damages intended to compensate persons for "mental anguish, bereavement and grief that those with a close personal relationship to a decedent experience . . . as well as the harm caused by the loss of the decedent['s] society and comfort." *Oveissi v. Islamic Republic of Iran*, 768 F. Supp. 2d 16, 25 (D.D.C. 2011) (internal citation and quotation marks omitted). Courts may presume that those in direct lineal relationships with victims of terrorism suffer compensable mental anguish. *Roth*, 78 F. Supp. 3d at 403. As for siblings, testimony proving a close emotional relationship will usually be sufficient to sustain an award of solatium damages. *Id.*

This Court developed a standardized approach for evaluating IIED claims for solatium damages in *Estate of Heiser*, where it surveyed past awards to family members of victims of terrorism to determine that, based on averages, "[s]pouses typically receive greater damage awards than parents, who, in turn, typically receive greater awards than siblings." 466 F. Supp. 2d at 269. Relying upon its evaluation of past average awards, the *Heiser* Court articulated a framework in which parents of deceased victims were awarded approximately $5 million and siblings received $2.5 million. *Id.*; *see also Valore*, 700 F. Supp. 2d at 85 (observing that this framework has been adopted by other courts as an appropriate measure of solatium damages for the family members of victims of state-sponsored terror).

In applying this framework, however, courts must be wary that "[t]hese numbers . . . are not set in stone," *Murphy*, 740 F. Supp. 2d at 79, and that deviations may be warranted when, for example, "evidence establish[es] an especially close relationship between the plaintiff and decedent, particularly in comparison to the normal interactions to be expected given the familial relationship; medical proof of severe pain, grief or suffering on behalf of the claimant [is

presented]; and circumstances surrounding the terrorist attack [rendered] the suffering particularly more acute or agonizing." *Oveissi*, 768 F. Supp. 2d at 26–27.

Max's parents and siblings seek solatium damages for IIED. After careful evaluation of plaintiffs' evidence, the Court concludes that each member of the Steinberg family—Stuart, Evie, Jake, and Paige—has sufficiently demonstrated the sort of personal connection with Max and mental anguish resulting from his death to support an award of solatium damages. On the other hand, the Court concludes that it shall not make an upward or downward departure from the normal solatium framework applied in state-sponsored terrorism cases. The evidence presented regarding the circumstances of this attack, including the relationships each family member had with Max, do not demonstrate an unusual degree of mental anguish that would warrant an increased or decreased damages award. Therefore, the Court concludes that Stuart and Evie Steinberg shall each receive $5 million in solatium damages, and that Jake and Paige Steinberg shall each receive $2.5 million in solatium damages.

### 4. Punitive Damages

The FSIA authorizes punitive damages to punish and deter foreign states from engaging in or materially supporting terrorism. *See Bodoff v. Islamic Republic of Iran*, 907 F. Supp. 2d 93, 105 (D.D.C. 2012). Four factors are relevant in deciding the level of punitive damages appropriate in a given case: "(1) the character of the defendants' act, (2) the nature and extent of harm to the plaintiffs that the defendants caused or intended to cause, (3) the need for deterrence, and (4) the wealth of the defendants." *Id.* (internal citation omitted). In accounting for these factor, Courts have developed several methodologies for awarding punitive damages to match the facts of a given case. For example, in situations where punitive damages have been awarded repeatedly against a defendant for the same conduct in a series of lawsuits, the Court should

consider whether to limit such damages so as not to over-punish that defendant for that particular

conduct. *See Murphy*, 740 F. Supp. 2d at 81. In cases where this has been a salient factor, the

Court has tied punitive damages to compensatory damages by applying a multiplier to the

amount of compensatory damages awarded. *Id.* at 81–83. The same compensatory multiplier

approach has been utilized when a plaintiff has not presented evidence relating to a country's

actual expenditures on terrorist activities. *See Harrison v. Republic of Sudan*, 882 F. Supp. 2d 23,

49–51 (D.D.C. 2012).

As to the factors relating to the need for deterrence and the wealth of the defendants, this

Court has repeatedly adopted a method for calculating an appropriate amount of damages based

on the magnitude of a defendant's support for terrorism. The Court has generally considered an

estimate of a defendant state's annual expenditure in support of terrorist organizations and

applied a multiplier to it, usually between three and five. *Haim v. Islamic Republic of Iran*, 784

F. Supp. 2d 1, 13 (D.D.C. 2011). This method is calibrated to produce an award that, while

proportional to a defendant's acts, is large enough to have a deterrent effect on the foreign state.

*Estate of Heiser*, 659 F. Supp. 2d at 30–31. An award of punitive damages by this calculation

may yield in the billions of dollars and is most appropriate in exceptionally heinous or deadly

attacks. *See Braun*, 228 F. Supp. 3d at 87.

Several courts in this district, including this one, have utilized another approach, in which

$150,000,000 in punitive damages is awarded to each affected family. *See Wyatt v. Syrian Arab

Republic*, 908 F. Supp. 2d 216, 232–33 (D.D.C. 2012); *Braun*, 228 F. Supp. 3d at 87; *Gates v.

Syrian Arab Republic*, 580 F. Supp. 2d 53, 75 (D.D.C. 2008). The Steinbergs ask for that figure

as an alternative to the expenditures multiplier theory. Mot. Default J. 49, ECF No. 18-1.

Precedent and proportionality weigh in favor of applying this fixed-sum approach here. Accordingly, the Steinberg family is entitled to $150,000,000 in punitive damages.

## IV.   CONCLUSION

For the foregoing reasons, the Court finds that defendants Iran and Syria are jointly and severally liable for the death of Max Steinberg and for the injuries to his family. It awards plaintiffs compensatory and punitive damages in the proportions set forth in the Order and Judgment accompanying this opinion, issued this date.

SIGNED this 15th day of November, 2019.

Royce C. Lamberth

United States District Judge